CHARLES M. THOMSON, Trustee, Appellee, v. IOWA STATE COM-
MERCE COMMISSION et al., Appellants; H. & W. MOTOR
EXPRESS COMPANY et al., Interveners, Appellants.

No. 46487.

SEPTEMBER 19, 1944.

REHEARING DENIED DECEMBER 14, 1944.

470

James A. Lucas, Commerce Counsel, for appellants.

Rex Fowler, of Des Moines, and D. C. Nolan, of Iowa City, for intervener appellants.

George E. Hise, of Des Moines, and P. F. Gault, of Chicago, for appellee.

MILLER, J.—On September 5, 1942, Charles M. Thomson, trustee for the Chicago and North Western Railway Company, filed an application with the Iowa State Commerce Commission for a certificate of public convenience and necessity to operate as a motor carrier of freight over ten specified routes between fixed termini. Public hearings were had at Des Moines and Sioux City, following which, on December 29, 1942, the application was denied by a written decision of Commissioner Richardson, with which Commissioner Reed concurred specially and from which Commissioner Keshlear dissented.

The decision of Commissioner Richardson pointed out that the application proposed that the railroad would substantially parallel its existing lines with motor transportation in northwest Iowa and between Anamosa and Clinton in eastern Iowa; that seventy-two witnesses from thirty-one points testified that the service would be beneficial to them as shippers or receivers of freight, in addition to which seventeen letters from various places, four telegrams, and eleven petitions which had signatures from one hundred sixty-five places, and resolutions from five civic bodies supported the application; but, on the other hand, nearly all existing motor carriers resisted the application asserting that what is proposed can be accomplished by those now holding operating rights; and concluded as follows:

"We have carefully reviewed the entire record, considered the existing transportation facilities; what is proposed by the applicant; what conditions are now with reference to rail transportation and also with a forcible realization of the national transportation conditions, we are unable to find, pursuant to the Law which governs the disposition of these matters that the establishment of the proposed service would promote public convenience and necessity, therefore, the authority here sought is denied."

Commissioner Reed's concurring opinion stated:

"In my opinion the evidence in this case is not sufficient to take the case out of the rule established in Docket H-2858. Therefore, I concur in the denial of the present application."

Commissioner Keshlear stated:

"While not retracting from my conclusion, as stated in my dissenting opinion in Docket No. 2858; in view of the opinion of the majority of the Commission to abide by the decision in that case, I have concluded not to file a dissenting opinion herein."

The decision in Docket H-2858 related to an application of the North Western Railway in 1940, and was cited and relied upon by Commissioner Richardson in his opinion herein.

The railroad, through its trustee, appealed to the district court of Polk county. The various truck operators who had resisted the application before the Commission intervened, asserting again that the proposed service would be a duplication of that which they are presently providing. The court recognized, in a written statement of findings and conclusions, that the case centers on the question of the sufficiency of the evidence to support the decision of the Commission and whether it was unreasonable and arbitrary. The court further stated:

"The record established without dispute that the applicant and appellant under its present set-up and restrictions on the railway lines involved is not rendering prompt freight service of its LCL [less than carload lot] shipments; that freight that should be delivered in one or two days is in many instances taking from four to twelve days delivery time; that the authority requested would materially expedite the movement and delivery of freight so that it would be delivered in one or two days from the time of receipt; that a large number of shippers and consignees of freight, also municipal public bodies are favorable to and believe that such expedited service will be of great benefit to them and that they prefer such railway service."

The court approved the following as a statement of the proposed service:

"Applicant merely proposes to improve an existing service through the utilization of motor vehicles in rendering a service which will be auxiliary to, supplemental of, and coordinate with the rail service. Applicant does not propose to invade territory of any other carrier. All of the points are stations on the rail line which applicant has served for years and is under obligation to continue to serve. Applicant merely proposes to improve that service in an endeavor to retain existing patrons, offering them a service more in keeping with their requirements under existing merchandising methods. To say that such service will adversely affect the operations of existing motor carriers is to admit superiority of the proposed service which protestants strongly deny."

The court further stated:

"It is the opinion of this court that there was a failure of any substantial proof by intervenors to the effect that the establishment of the proposed service would not promote the public convenience and necessity; that there was an abundance of proof that it would."

The court specifically found as follows:

"1. That the appellant has established by an abundance of evidence the public convenience and necessity for the operations and service which it proposes to render.

"2. That the intervenors failed to meet the burden of proof presented by the appellant and that there is not sufficient competent evidence in the record on which the commission could base its decision.

"Therefore, it is the conclusion of this court, as a matter of law, that the action of the commission was without proper support in the evidence and therefore their action was unreasonable and arbitrary and their order will be reversed."

Pursuant to the foregoing, judgment was entered reversing and setting aside the order of the Commission and remanding the cause for further proceedings not inconsistent therewith. The Commission and the interveners have appealed to this court.

I. At the outset, we undertake to briefly state the over-

all picture of the controversy which we are here called upon to decide. Regulation of public utilities and common carriers by administrative bodies, such as the Commerce Commission herein, is a very necessary and well-established practice. The necessity therefor arises out of the fact that the businesses so regulated are in many ways analogous to monopolies. Over a century and a half ago, Adam Smith, in his ''Wealth of Nations,'' pointed out that monopolies, if left to their own devices, are detrimental to the public welfare because they seek to take advantage of their favorable situation and exact from the public exorbitant charges for indifferent service. Administrative regulation is therefore necessary to insure fair and reasonable charges for efficient and adequate service. No tariff rates are involved herein. The Commission's specific concern was what should constitute efficient and adequate service to the public under the facts shown by the record.

The basis upon which the Commission should act is concisely stated in Application of Thomson, 143 Neb. 52, 53, 8 N. W. 2d 552, 554, as follows:

''The prime object and real purpose of Nebraska state railway commission control is to secure adequate, sustained service for the public at minimum cost and to protect and conserve investments already made for this purpose. In doing this, primary consideration must be given to the public rather than to individuals.''

The foregoing pronouncement is immediately preceded by this statement:

''If an order of the Nebraska state railway commission is administrative or legislative in character as distinguished from the judicial function, the only question for decision on appeal is whether its action was unreasonable or arbitrary, within its jurisdiction, or violative of legal and constitutional rights.'' (Citing cases.)

This court has held repeatedly that, in determining whether or not to issue a certificate of public convenience and necessity such as that herein applied for, the Commission exercises an administrative or legislative function as distinguished from a

judicial function and that, on an appeal such as this, its decision can be set aside only if it acted without and in excess of its jurisdiction, or if its order is without support in the record, or is arbitrary and unreasonable. Burlington Transp. Co. v. Iowa State Commerce Comm., 230 Iowa 570, 298 N. W. 631; In re Appeal of Beasley Bros., 206 Iowa 229, 220 N. W. 306; In re Application of Waterloo, C. F. & N. Ry. Co., 206 Iowa 238, 220 N. W. 310; Campbell v. Eldridge, 206 Iowa 224, 220 N. W. 304.

In Burlington Transp. Co. v. Iowa State Commerce Comm., supra, we point out that the Commission, in exercising delegated legislative or administrative power, does not have the power, in and of itself, to determine what shall be the public policy of the state, but merely has authority to carry out the details of a public policy originally determined by the legislature, stating, at page 576 of 230 Iowa, page 634 of 298 N. W., as follows:

"This court has repeatedly recognized that the legislature has the power to delegate to an administrative board broad power in the 'working out of details under a legislative act,' provided that the power delegated be properly restricted so that it constitutes merely ' '' [filling] up the details'' after the legislature has laid down ''an intelligible and complete declaration of policy which is definite in describing the subject to which it relates or to the field wherein it shall apply.'' ' Miller v. Schuster, 227 Iowa 1005, 1017, 289 N. W. 702, 708, and cases cited therein.''

In 9 Am. Jur. 489, section 87, it is stated:

"It is well settled that a statute or an order of a commission acting under legislative authority, the purpose and effect of which are to control and regulate the business of a common carrier by prescribing rates, or otherwise, is not final or conclusive. There exists in every such case the right of the carrier or of the stockholders of a corporate carrier to a judicial hearing upon, and determination of, the question whether the rate or regulation so fixed or prescribed is reasonable and within the proper limits of the legislative power.''

In In re Application of Waterloo, C. F. & N. Ry. Co., supra, we state, at pages 241 and 242 of 206 Iowa, page 312 of 220 N. W., as follows:

"The determination of an issue as to what the public convenience and necessity require in the way of motor bus transportation involves a consideration of the extent of the territory to be served, the population thereof, amount of travel, existing facilities, etc."

In Wisconsin Tel. Co. v. Railroad Commission, 162 Wis. 383, 396, 156 N. W. 614, 617, L. R. A. 1916E, 748, 754, the words "public convenience and necessity" are defined as follows:

"The words are not synonymous and effect must be given both. The word 'convenience' is much broader and more inclusive than the word 'necessity.' Most things that are necessities are also conveniences, but not all conveniences are necessities. * * * The word 'necessity' has been used in a variety of statutes * * * It has been generally held to mean something more nearly akin to convenience than the definition found in standard dictionaries would indicate. So it is said the word will be construed to mean not absolute but reasonable necessity."

In the four Iowa cases heretofore cited, this court, in each instance, sustained the Commission's determination that public convenience and necessity warranted the issuance of the certificate which was sought. Accordingly, on the precise issue now before us, we do not have a specific example of a determination that the action of the Commission was so arbitrary or unreasonable as to warrant or require interference by the courts.

The briefs of counsel contain many other authorities. We will refer to but a few at this point. The Commission cites the case of State ex rel. Railroad Co. v. Public Service Comm., 327 Mo. 249, 259, 37 S. W. 2d 576, 580, 75 A. L. R. 232, wherein the court sustained the Commission's denial of a certificate, stating as follows:

"It is clear that granting the application in this case would amount to more than a mere substitution of motor bus transportation for abandoned train transportation. It would, as above pointed out, result in increased competition with estab-

476

lished motor-bus service which the business and public necessity do not justify, and would inevitably prove detrimental to and probably destructive of the now established motor carrier agencies, to the ultimate detriment, we think, of the public convenience and interests."

The Commission also cites the case of Superior Motor Bus Co. v. Community Motor Bus Co., 320 Ill. 175, 180, 150 N. E. 668, 670, wherein the granting of a certificate was reversed, the court stating as follows:

"The evidence in the case showing that appellant had been meeting all the requirements of the public and of the commission between Belleville and Mascoutah, and that it was ready, able and willing to render efficient service to the public, and it being conceded by all parties that there was not sufficient traffic over this route to justify the operation of two motor bus lines, the action of the commission in granting a certificate of convenience and necessity to appellee was in violation of the rules laid down in the authorities cited and was unreasonable, arbitrary and confiscatory."

The Commission contends that the record is such as to bring the case under the rules of law last above quoted. The railroad, on the other hand, contends that the record is not subject to any such interpretation and that the Commission disregarded uncontradicted testimony which fully justified the granting of the application. Counsel quote from a decision by a three-judge federal court in Baltimore & O. R. Co. v. United States, D. C., Ohio, 5 F. Supp. 929, 936 [affirmed 293 U. S. 454, 55 S. Ct. 268, 79 L. Ed. 587], wherein various decisions of the Supreme Court of the United States are reviewed and a decision of the Interstate Commerce Commission is set aside as arbitrary, the court stating as follows:

"Epitomizing what has already been said—the commission was bound to give legal effect to facts established in evidence, Oregon R. & N. Co. v. Fairchild, 224 U. S. 510, 525, 32 S. Ct. 535, 56 L. Ed. 863; its order should be set aside if disregard by it is shown of substantial and uncontradicted evidence having a bearing upon the issue, S. W. Bell Tel. Co. v. Public Service

Commission, 262 U. S. 276, 287, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; and to refuse to consider pertinent and substantial evidence is considered arbitrary action, sufficient to set aside its order, Chicago Junction Case, supra.''

· The trial court found that this case falls within the rules last above quoted.

II. As heretofore pointed out, the decision of the Commission herein is predicated upon a prior decision on a previous application of the North Western Railway Company in 1940, identified as No. H-2858, reported in the 1940 Report of the Commission, at pages 168 to 183. The railroad contends that Commissioner Reed inadvertently applied the doctrine of res adjudicata or that of stare decisis to an administrative or legislative function in which neither doctrine has any application. But we do not so interpret the record. No. H-2858 was a bitterly contested case, decided by Commissioners Richardson and Conway, with Commissioner Keshlear dissenting. We think that Commissioner Reed merely expressed the view that the facts herein brought this case within the rules there applied and that Commissioner Keshlear intended to express the view that his dissenting opinion in that case would express his views as to the proper disposition to be made herein. Such being our interpretation, it is important to consider what transpired in H-2858.

The majority ·and dissenting opinions in H-2858 are quite elaborate. Space does not permit more than brief quotations therefrom. The views of the majority are summarized at page 173 of the 1940 Report, as follows:

''With unimportant exceptions, all of the points proposed to be served by the applicant are now served by existing motor carriers. The protesting carriers offered evidence to show that the service now available in the territory is adequate to meet the public demand, and that there is no public need for additional rail or motor carrier service to the points proposed to be served by the applicant. · Viewing the evidence as a whole, the conclusion is justified that the existing rail and highway service is adequate. The protesting carriers also offered evidence to show that substantially all of the points proposed to be served by

the applicant are now receiving next day delivery service from the principal shipping centers in the state; that if the applicant is permitted to establish duplicate competitive service, it would bring about a diminution of their revenue and tonnage to the extent that the service now being afforded by them would of necessity have to be curtailed or eventually abandoned. The protesting carriers also offered evidence to show that there had been established, responsive to public demand, service on so-called loop routes in territory adjacent to the immediate territory involved in this application, and that if their revenues were to be diminished as a result of the competition of applicant, the service now afforded on these loop routes would have to be curtailed or abandoned.''

Commissioner Keshlear's views are expressed by the following quotations, from pages 176, 178, 179, to wit:

"It is my view that an approval of the application as presented in this case would have been an approval of a strictly limited type of service. The service proposed is really a sequence of operations, each to be performed within a particular division, independently for all practical purposes, of the motor operations within other divisions. As far as exclusively motor operations are concerned the only competitive effect of the proposed service would be in connection with short intra-division hauls. Revenue from such hauls, in comparison with protestants' total revenues, is of minor importance. As a practical matter, I believe, the substantial part of operations under applicant's time schedule would necessarily have been confined to the movement of freight previously moved by rail or destined for further rail movement.

"Any doubt in the minds of the majority as to the practical accomplishment of the suggested effect by the self imposed limitation of applicant's time schedule could have been satisfactorily resolved by recourse to this Commission's statutory power to grant a certificate 'upon such terms, conditions and restrictions * * * as may seem * * * just and proper.' Under this power we could have specifically limited applicant, *with force of law* to the haul of commodities destined for further rail movement, or commodities previously moved into the area

by rail. Alternatively we might have specifically prohibited applicant from the movement of freight past any division point.

"It is my thought that the proceedings *actually* before us has required only a consideration of a supplementary and auxiliary rail service—in a manner of speaking, a type of extended pick up and delivery service. As to the effect of a more unlimited service on the public welfare, such should properly have been left for consideration at such future time as applicant might propose an extension of operation.

"I find a practically unanimous agreement of those of the authorities in the matter which I have investigated to the effect that a service of the limited type discussed above would promote the public convenience and necessity. Some form of coordinated motor-rail service limited to the transportation by motor of commodities under through bill of lading destined for further rail movement or previously moved by rail, almost invariably has been permitted in competitive situations, under State and Federal statutes similar to our own. * * *

"I do not mean to say by the foregoing that it is my view that this Commission should depart at this time from its previous policy of denying applications for competitive service in the ordinary situation. Had applicant in this proceeding been an independent motor carrier, offering no better or different service than that presently performed by protestants, I should have joined with the majority in denying this application for want of public convenience and necessity. My previously expressed views are simply to the effect that this Commission is bound by no rule of law or even by any rule of stated policy invariably to reject an application for competitive service. It is my position that in a proper case such service may and should be permitted, and it is my further position that this is a proper case."

Commissioner Richardson based his decision herein in part on the rules applied in H-2858, and Commissioners Reed and Keshlear confined their views strictly to the question whether the rules applied in H-2858 were applicable herein and controlling. Without Reed's concurrence, Richardson's decision would not constitute the decision of the Commission. Thus we are faced with the question whether the rules applied in H-2858 are here controlling. The record in that case, of course, is not

before us. That is immaterial. The rules applied thereto are clearly stated. The trial court in effect found that the Commission was in error in applying the rules announced by the majority in H-2858 to the record made herein; that in so doing it refused to consider substantial and uncontradicted evidence which supports the contentions of the railroad, made a decision that is not supported by the record, and that, by so doing, the decision was arbitrary and unreasonable.

III. As heretofore pointed out, the decision of Commissioner Richardson recognized that there was substantial evidence herein to sustain the contentions of the railroad. Of this there can be no doubt. The trial court was right in so holding. In determining whether the Commission or the trial court was right in deciding the effect to be given the record made by the resisting carriers, it is vitally important to bear in mind that the service the railroad seeks authority for is merely auxiliary to, supplemental of, and co-ordinated with its rail service. Were this an application by an ordinary truck operator to merely duplicate existing motor-carrier service, there is little doubt that the denial of the application was adequately supported by the record. It is only when proper emphasis is placed upon the special kind of service and its limitations as such that the erroneous character of the Commission's decision becomes apparent.

The testimony introduced in support of the application herein comprises over one hundred pages of the printed record. In addition thereto, a large number of exhibits have been certified to us. This record definitely establishes that the kind of service proposed is highly desirable, distinctly beneficial, and reasonably necessary to the public welfare. That it is a special service, merely auxiliary to or supplemental of the rail service, is demonstrated by the testimony of George W. Hand, chief executive officer of the railroad, as follows:

"We propose to combine truck hauls with rail hauls. Most of this freight will still be moved the greater part of the way by rail. * * * The movement of freight will be only between freight stations and not directly either to shippers or receivers. It will be picked up at one freight house and delivered at an-

other and is essentially an entirely different type of service from that performed by motor carriers generally. These movements of freight will be under bills of lading of the railway and the charges will be at applicable rail rates and tariffs.

"It will be performed under the supervision, direction and control of the same personnel of the railway that supervises, directs and controls the railway train, station pickup and delivery service in this area so that there will be complete and perfect coordination between truck operations and train operations and station service. For the service to be satisfactory and yield the benefits it is capable of in full measure a high degree of coordination is essential. This can only be brought about where it is completely under the control of the railway management in every respect."

The protesting motor carriers furnish no transportation by rail. No one of them is authorized to operate over the entire territory involved. Collectively, they do serve the territory as motor carriers only. But they do not and cannot furnish the type of service here proposed. It could be supplied only through agreements with the railroad. Most, if not all, of the interveners offered assurances that they would be willing to work with the railroad. The testimony of the railroad's witnesses was that no satisfactory arrangement had been worked out and that none was possible because so many conflicting details in the operations of so many systems made proper co-ordination impossible. There were only two protesting carriers who anticipated a detrimental effect of the railroad's operations on their lines and each testified that it would adversely affect only a small part of their total operations. The trial court found that the evidence of the interveners "failed to meet the burden of proof presented by" the railroad. This language was unfortunate. The railroad, of course, had the burden. We think that the court in fact held that the railroad met its burden and that the evidence of the interveners was insufficient to sustain a ruling adverse to the railroad. So interpreted, the court's holding was right.

IV. The question here before us has been passed upon many times by the Interstate Commerce Commission and it has consistently held that a showing such as that made by the railroad herein requires the issuance of a certificate of public conven-

ience and necessity and that a showing such as that made by the interveners herein is wholly insufficient to warrant denial of such a certificate.

In the case of Pennsylvania Truck Lines, Inc., Acquisition of Control of Barker Motor Freight, Inc., 1 M. C. C. (Motor Carrier Cases) 101, 111, the Commission states:'

"The proof is convincing that over some of the routes in question the railroad can 'use service by motor vehicle to public advantage in its operations.' The motor vehicle can undoubtedly be used as a very valuable auxiliary or adjunct to railroad service, particularly less-than-carload service, and the many opportunities for such use here have been pointed out of record and are clear. Such coordination of rail and motor-vehicle operations should be encouraged. The result will be a new form of service which should prove of much public advantage. Nor do we believe that the creation of this new form of service will 'unduly restrain competition.' On the contrary, it should have the opposite effect."

In the case of Application of Kansas City Southern Transport Co., 10 M. C. C. 221, 237, 238, the Commission states:

"Protestants now meet with the competition of the railway, but, in the case of the merchandise traffic handled in less-than-carload lots, that competition has not been particularly formidable. The railway now proposes to improve the handling of that traffic by establishing a coordinated truck-rail service in connection with applicant. As we have seen, the conclusion is warranted that there is a public need for this coordinated service, that it is a new and different character of service which neither the railroads nor the trucks alone can supply, and that it cannot be furnished effectively and well except through the use of applicant's facilities. We do not believe that the development of this new form of service will seriously endanger the operations of protestants, but, in any event, the public ought not to be deprived of the benefit of an improved service merely because it may divert some traffic from other carriers. If that principle had been followed, indeed, no motor-carrier service could have been developed."

In the case of Willett Co., Inc., Extension of Operations, 21 M. C. C. 405, 408, 409, the Commission states:

"The coordinated rail-truck service differs from the service given by the railroad alone or by competing motor carriers alone. It is a new form of service utilizing both rail and motor-vehicle transportation to advantage and in such a way as to render a merchandise service which is much less expensive and at the same time more expeditious and more convenient and generally satisfactory to the public served. Applicant has been performing such service in conjunction with the railroad over several of the routes herein requested since prior to October 15, 1935. That the benefits to be derived from such coordinated service have been and can be achieved is clear.

"While there are a large number of motor carriers, other than applicant, operating in the territory under consideration, the railroad contends any such plan of coordination through the utilization of their service would be impracticable. * * * In order to establish the coordinated service through the cooperation of these motor carriers it would be necessary, therefore, for the railroad to make arrangements not with one, but with several, each performing a more or less disjointed part of the entire service, and it would also be necessary for them to obtain authority to serve rail points which they do not now serve. Moreover, most if not all serve points, and often important points, not served by the railroad. They would find it difficult to adjust their schedules to meet the needs of the coordination with the rail service without disrupting or impairing their service to the off-rail points. In addition, we are without jurisdiction to compel coordinated service between carriers by rail and carriers by motor vehicle. It could only be accomplished through the medium of through routes and joint rates, and we have no power to require their establishment. It follows that any such plan must be dependent on voluntary cooperation. In view of the close adjustment of schedules and interchange arrangements which good dependable service requires, as well as the use of joint facilities, we believe the railroad has sound ground for its contention."

In the case of Chicago & N. W. Ry. Co., Extension of Operations, 30 M. C. C. 379, 381, the Commission states:

"There is no doubt that the existing interstate motor-carrier service is adequate, but the record does not justify a conclusion that protestants would lose any appreciable amount of traffic by reason of the proposed service. On the other hand, it is clear, we think, that the proposed operation will result in a more efficient and economical service than that now afforded by applicant. We have, on numerous occasions, pointed out that we are without jurisdiction to compel coordinated service between carriers by rail and carriers by motor vehicle through the establishment of through routes and joint rates, and that the public ought not to be deprived of the benefit of the improved service merely because it may divert some traffic from other carriers."

The pronouncements above quoted have been repeatedly recognized and applied. The following cases are illustrative: Seaboard A. L. Ry. Co., Operation, 17 M. C. C. 413; Missouri Pac. R. Co., Application, 22 M. C. C. 321; Kansas City Southern Transport Co., Application, 28 M. C. C. 5; Illinois Cent. R. Co., Extension, 30 M. C. C. 477; Chicago & N. W. Ry. Co., Extension, 31 M. C. C. 455; Pacific Motor Truck Co., Application, 34 M. C. C. 249; Chicago, M. & St. P. R. Co., Extension, 34 M. C. C. 475; Seaboard A. L. Ry. Co., Extension, 34 M. C. C. 511; Seaboard A. L. Ry. Co., Extension, 34 M. C. C. 725; Illinois Cent. R. Co., Extension, 41 M. C. C. 211; Missouri Pac. R. Co., Extension, 41 M. C. C. 241; Pacific Motor Trucking Co., Extension, 41 M. C. C. 469.

Of course, the decisions of the Interstate Commerce Commission are not binding precedents upon this court. However, the principles announced and applied in the foregoing decisions are so eminently fair, sound, just, and reasonable that we have no hesitancy in adopting them as tenets which should be applied in determining whether the Commission should have issued a certificate of public convenience and necessity under the facts herein. We have carefully examined the numerous cases cited by the Iowa Commission. None is in point or persuasive and certainly none is in any way decisive or controlling. The length of this opinion forbids a detailed analysis thereof. We are

satisfied that, when the Iowa Commission shut its eyes to the basic principles, repeatedly recognized and applied by the Interstate Commerce Commission, it thereby disregarded the substantial rights of the applicant railroad. Its decision became manifestly unsound, unfair, arbitrary, and unreasonable.

V. The record shows that the applicant railroad has been in operation many years. Most of its lines have been in operation a half century or more and all of them for at least forty years. These facts are common knowledge. The great system of paved highways over which the interveners operate was nonexistent prior to 1919. The paving program did not get into full swing until about 1927 and was in the course of construction for a number of years thereafter. Prior to the construction of such a system of highways the railroads had no substantial competition from motor carriers. With the development of such highways, however, motor carriers of freight were authorized to operate thereon and developed direct competition with the railroads. The railroads felt the effect of such competition. But they could not stifle it. They could only endeavor to meet it. The public interest is paramount and must prevail over the interests of any particular group. Now this railroad seeks to do that which the Interstate Commerce Commission has authorized throughout the country, to wit, improve its service by an auxiliary or supplemental system of co-ordinated rail and truck service. The public wants such service. It is definitely convenient and reasonably necessary. The public is entitled to it.

But section 5100.06, Code, 1939, makes it unlawful for the railroad to operate as a motor carrier without a certificate of public convenience and necessity. Application was made therefor. Hearings were had thereon. Various motor carriers resisted the application. But, under the record here made, they have no more right to deprive the public of the service here proposed than the railroads would have had to deprive the public of the services of motor carriers. The record showed that the railroad is entitled to a certificate. But the Commission denied the application. Sections 5100.21 to 5100.23 of the Code authorize an appeal. Such an appeal was taken. The record required a reversal. The court so held. Its decision was right.

486

There may be some question whether, under the record, the application is as strictly confined to an auxiliary or supplemental service as it should be. However, the case was tried below and is submitted here on the theory that such is all that the railroad seeks. As suggested by Commissioner Keshlear, sections 5100.09 and 5100.18 of the Code give the Commission express authority to attach any necessary conditions to the issuance of the certificate. The certificate should be limited to transportation of commodities previously moved into the area by rail or destined for further movement by rail.

Other questions are argued in the briefs, including some based upon constitutional provisions. It is not necessary to discuss or decide them. The foregoing propositions are decisive. Accordingly, the judgment is—Affirmed.

MANTZ, C. J., and HALE, SMITH, MULRONEY, GARFIELD, BLISS, and WENNERSTRUM, JJ., concur.