Application of the Baker Sales Barn, Inc., for a Certificate of Public Convenience and Necessity Authorizing the Operation of a Livestock Market at Baker, Montana.

Baker Sales Barn, Inc., Applicant and Respondent *v.* Montana Livestock Commission, Appellant.

No. 10183.

Submitted March 8, 1961. Decided January 4, 1962.

367 P.2d 775.

Judgment reversed and remanded with directions. Mr. Justices John C. Harrison and Adair dissented.

Robert J. Emmons, Great Falls, Ralph J. Anderson (argued orally), Stanley P. Sorenson, Helena, for appellant.

F. F. Haynes (argued orally), Forsyth for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment of the district court of Fallon County, which judgment ordered the appellant, Mon-

tana Livestock Commission, to issue forthwith a Certificate of Public Convenience and Necessity to the respondent, Baker Sales Barn, Inc., upon the filing of satisfactory bonds required by the rules of the Commission.

The cause arose out of an application by the respondent to the appellant Commission for a Certificate of Public Convenience and Necessity authorizing the licensing of a livestock market at Baker, Montana, under the provisions of R.C.M. 1947, § 46-908, et seq. There were presented to the appellant Commission three applications for a Certificate. The first application was denied; the record in that application is referred to as Docket No. 24 of the Commission, and it was heard on June 30, 1958. The second application was by one Gerald J. Stenberg, the record being referred to as Docket No. 25. That application was heard on September 29, 1958, and due to the death of Stenberg before decision, no decision was rendered. The third application was by the respondent Corporation; it was heard on June 1, 1959, and is referred to as Docket No. 26. Dockets Nos. 24 and 25 were introduced at the third hearing, were considered by the Commission and are part of the record on this appeal. The Commission denied the application.

The applicant took an appeal to the District Court pursuant to the provisions of section 46-917, R.C.M.1947. That Court, on the basis of the record contained in the three aforementioned Dockets, rendered an opinion in which it held section 46-917 unconstitutional as a denial of the right to acquire property and of being deprived of property without due process of law and as violative of the fourteenth amendment to the Constitution of the United States. The district court also found that the Commission acted capriciously and arbitrarily and abused its discretion.

R.C.M.1947, § 46-917, provides in part:

"* * * The trial shall be had summarily before the district court upon the record of the evidence presented to the

commission of which a complete record must be kept of the hearings of the commission as shown by said transcript and the exhibits, if any, presented to the commission and * * * upon which its decision was rendered and *there shall not be any additional evidence introduced or anything in the nature of a trial de novo.* The court shall not substitute its discretion for that of the commission but shall determine whether the commission acted capriciously, arbitrarily, or abused its discretion and whether it acted according to law." Emphasis supplied.

It is the foregoing underlined part of section 46-917 which the district court found unconstitutional. The court did not take additional evidence and seems to have made its holding on constitutionality gratuitously since it was also found that the Commission acted capriciously, arbitrarily and abused its discretion. Upon this basis the court then set aside the Commission's denial of the application and ordered the Certificate of Convenience and Necessity to issue.

The district court wrote an opinion with its order, and in such opinion the district court said:

"This brings us to the only matter to be considered by the Commission in this cause as to whether a certificate for a market should be granted at Baker, and as to its convenience or necessity. The testimony is clear that it would be much more convenient for the areas in Fallon and Carter Counties, Montana, to avoid the long haul and narrow roads to Miles City, Glendive or Sidney. As to necessity there is the Milwaukee Railroad at Baker and ranchers can ship to Chicago or some other large terminal. The same question might be asked as to Miles City, Glendive or Sidney. Necessity and convenience are synonymous, but difficult to prove and for this reason the law leaves the authority in the Commission that, because necessity and convenience have not been proved, they can deny the application for the certificate.

"In other words, this leads to the creation of a monopoly for

the markets in Montana and a denial of our citiziens to engage in free enterprise.''

Before going further to set out some background facts from the record, it should be observed that the foregoing quotation from the district court's opinion is strange and most confusing. It does, however, reveal the error in the district court's decision as will be hereinafter discussed.

At the time of the hearings in this case before the Commission, there were fourteen livestock markets in Montana distributed somewhat geographically in the state. Those markets were located at Hamilton, Missoula, Great Falls, Havre, Glasgow, Butte, two at Billings, Bozeman, Lewistown, Miles City, Shelby, Glendive, and Sidney. Of course there are many other out-of-state markets, the particular ones of some influence in the area here involved being at Bowman and Dickinson, North Dakota, and Belle Fourche, South Dakota.

Baker, Montana, the scene of the application, is the county seat of Fallon County in southeastern Montana. It is on the main line of the Milwaukee Railroad. Highways extend east and west and north and south. It is about eighty miles east of Miles City and eighty miles south of Glendive. These are the only two Montana markets which have any effect on the area.

The record generally reveals that Baker would draw from a ranching area, being mainly range country with relatively small amounts of feeding operations. Generally, too, the bulk of marketing of cattle, upon which the market would be largely dependent, would be and is confined to the Fall months of the year. Much of the testimony regards the distances to markets and the fact that for a rather large local area, the distance would be materially less to market if a market were established at Baker.

The statutes of Montana, sections 46-901 to 46-921, set up a comprehensive livestock market regulation covering subjects including brand inspections, quarantine and sanitation, sale of stray stock, warranty of title, record-keeping, etc., all de-

signed generally for the protection of, and service to livestock producers.

Specifically section 46-907 provides for regulation by the State Livestock Commission and Sanitary Board.

Section 46-908 provides for certificates for each application "declaring that public convenience and necessity require such operation" and sets forth the requirements of the application.

Section 46-909 provides for hearings, notice and procedure on applications and then states:

"If, after hearing upon such application, the commission shall find from the evidence that public convenience and necessity require the authorization of the proposed livestock market, a certificate therefor shall be issued to the applicant. In determining whether or not public convenience and necessity require such livestock market, the commission shall give reasonable consideration to the service rendered by other existing livestock markets in the state and the effect upon them if the proposed livestock market is authorized, and shall give due consideration to the likelihood of the proposed service being permanent and continuous throughout twelve (12) months of the year; provided, however, that the commission shall not authorize the proposed livestock market unless it shall appear from the evidence submitted at the hearing that the minimum revenue derived by the state from inspection fees shall be equal to seventy-five per cent (75%) of the cost to the state in maintaining a resident livestock inspector and an office for him at such proposed livestock market, and the cost of maintaining such office of a sufficient record of the recorded livestock brands and marks in the state; provided, however, that the commission may authorize the same *if the operator of the proposed market shall by bond approved by the commission guarantee the payment of such minimum revenue.*"

Although the latter provision relating to seventy-five percent of the cost of a resident livestock inspector figured in the Commission's findings, the applicant corporation did provide

for its bonding and we deem that particular matter unimportant in the discussion of the case.

It is the first part of the above quotation from 46-909 which we deem of importance to this decision. The evidence demonstrated that the proposed Baker market would not materially affect any Montana market; it being shown that not more than about eight percent of the cattle sold in both Miles City and Glendive came from the Baker area. The Commission in its findings *did not rely on the effect on other in-state markets.*

The part that did receive attention was "convenience and necessity". The statutes do not define these terms. The hearings held and evidence adduced went to proof or lack of proof of "convenience and necessity" and the allied problem of the "proposed service being permanent and continuous throughout twelve (12) months of the year."

The record is voluminous. Many witnesses appeared for and against the petition. By and large, the figures used by all witnesses came from the Livestock Commission's own records or government reports. Most of the testimony on crucial points amounted to opinion testimony by the very nature of the problem.

The specifications of error bring forth two main questions. First, did the Commission act capriciously and arbitrarily in arriving at its findings and conclusions in such a manner and on such evidence that it abused its discretion, and second, is section 46-917, subd. (b) unconstitutional?

As to the latter question, as remarked before, the district court did not hear additional evidence and gratuitously made the finding of unconstitutionality. The court held that the Commission did abuse its discretion. If it were correct in this determination, it did not need to go into any constitutional question and under the familiar rule announced many times we shall not go into constitutional matters unless it is considered necessary to a decision on the merits. Yellowstone Bank v. State Board of Equalization, 137 Mont. 198, 351 P.2d 904;

State ex rel. Burns v. Lacklen, 129 Mont. 243, 284 P.2d 998; Monarch Mining Co. v. State Highway Commission, 128 Mont. 65, 270 P.2d 738; In re Clark's Estate, 105 Mont. 401, 74 P.2d 401, 114 A.L.R. 496.

As to the first question, which we think is determinative of this appeal, the district court seemed to assume, if we give credence to what it wrote in its opinion, that livestock markets are not proper subjects for governmental licensing on the basis of convenience and necessity. That livestock markets are such subjects has long been recognized as public utilities subject to somewhat stringent governmental supervision. See Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Tagg Brothers & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524.

Our court has not held squarely on the point but in Montana Meat of Helena v. Missoula Livestock Auction Co., 125 Mont. 66, 71, 230 P.2d 955, 958, the above-cited Federal cases were noted and this court said:

"Since stockyards under the federal law are in the nature of public utilities and under state statutes are subject to rigid control and inspection and can only be established after hearing and issuance of a certificate of public convenience and necessity, they are of a different class than ordinary agents. They are required to furnish their stockyards services without discrimination. Their rates are regulated. They do a large business and therefore their services are largely impersonal. They are not at liberty to select their customers or the principals for whom they sell. They are thus inhibited in their freedom to investigate the title of the livestock they sell. Because of their volume of sales and the impersonal relationship with their patrons they should not be required to have the same responsibility in vouching for the good faith and the integrity of the sellers they represent that other agents have. They are required and should be required to follow explicit instructions from their principals. They must make settlement of accounts

within such time that it would be economically impossible to investigate the records of all of the county clerks and recorders in the state of Montana.

"The legislature is justified in treating rigorously regulated and licensed livestock markets differently than ordinary agents or factors. If in the legislative wisdom social convenience is subserved by removal of certain obstructions in order that the sale of livestock may proceed in an orderly manner, the legislature is free to make such a classification." See also 50 Am. Jur., Stockyards, § 7, p. 661.

Thus, it being conceded that legislative regulation of livestock markets is proper, it follows that the legislature can and does place the administration in the Livestock Commission. In its creation of the agency to administer the legislation, the legislature has granted certain discretionary powers. One of these powers, that we are here concerned with, is the power to determine whether or not a showing of convenience and necessity has been made.

It needs no citation of authority to say that this discretionary power is not an unrestricted power. It must be based on a reasonable use of the power. The statute, section 46-909, establishes the limits of the power in as reasonable a manner as words can describe. On review provided in the district court under section 46-917 the legislature specifically left discretion in the Commission and left to the court only the duty to examine the records made before the Commission to determine whether the latter acted, "capriciously, arbitrarily, or abused its discretion and whether it acted according to law." That this is proper has been discussed by this court in Peterson v. Livestock Commission, 120 Mont. 140, 150, 181 P.2d 152, 157, wherein it was said:

"The only proper questions that may be tried by a court on appeal from an order such as the one here involved is whether the commission acted capriciously or arbitrarily or without jurisdiction or authority under the law. [Citing cases.]"

And, as was said in Fulmer v. Board of Railroad Com'rs, 96 Mont. 22, 35, 28 P.2d 849, 853:

"Neither litigants nor citizens can complain because an officer or a board exercises a discretion specifically granted through legislative authority. If a power is unwisely given, it must be revoked by the same authority that gave it."

The district court recognized the above quotation in its opinion by suggesting that farmers and ranchers pay more attention to the members they elect to the legislature.

And so, on this appeal, we should look to the record made before the Commission just as did the District Court. As remarked before, the record is voluminous. Most of the figures relied upon by both the applicants and protestants came from the Livestock Commission's own records.

First, relating back to the quoted portion of the district court's opinion, convenience and necessity are not synonymous. If the legislature had so meant they need not have used both.

The Supreme Court of Iowa considered the meaning of these terms in Thomson v. Iowa State Commerce Comm., 235 Iowa 469, 15 N.W.2d 603, 606, and said:

"In Wisconsin Tel. Co. v. Railroad Commission, 162 Wis. 383, [396,] 156 N.W. 614, 617, L.R.A.1916E, 748, the words 'public convenience and necessity' are defined as follows:

" '*The words are not synonymous, and effect must be given both.* The word "convenience" is much broader and more inclusive than the word "necessity." Most things that are necessities are also conveniences, but not all conveniences are necessities. * * * The word "necessity" has been used in a variety of statutes * * *. It has been generally held to mean something more nearly akin to convenience than the definition found in standard dictionaries would indicate. So it is said the word will be construed to mean not absolute, but reasonable necessity' ". Emphasis supplied.

See also 9A Words and Phrases, Convenience; Convenient,

108, 109, and Clintonville Transfer Line v. Public Service Comm., 248 Wis. 59, 21 N.W.2d 5, where the court, quoting from Union Pac. R. Co. v. Public Service Comm., 103 Utah 459, 135 P.2d 915, 917, said:

" 'Necessity means reasonably necessary and not absolutely imperative. * * * The convenience of the public must not be circumscribed by holding the term "necessity" to mean an essential requisite. * * * It is necessary if it appears reasonably requisite, is suited to and tends to promote the accommodation of the public. * * * The statute should be so construed and applied as to encourage rather than retard * * * the quality of the service rendered to the public * * * to the end that both the quality and quantity of that which is offered to the public * * * may be improved and increased * * *. Any service or improvement which is desirable for the public welfare and highly important to the public convenience may properly be regarded as necessary. * * * A service is not necessarily adequate because the community * * * can conduct its business without further or additional service. * * * To be adequate they must safeguard the people generally from appreciable inconvenience in the pursuit of their business * * *.' "

The legislature of Montana has not attempted to define the terms "public convenience" and "necessity" nor has it declared where or how or under what circumstances public convenience and necessity would or would not be promoted by the creation of additional livestock markets in Montana. It has left this determination to the Board. That this is a difficult determination involving many imponderables may be conceded, but obviously it is a decision which is better left to an administrative body composed of persons experienced in the field as the members of the appellant Commission are required to be by statute. See section 46-101, R.C.M.1947.

This court has heretofore discussed the term "public convenience and advantage" in Northern Pacific Ry. Co. v. Ben-

nett, 83 Mont. 483, 498, 272 P. 987, 991, quoting from Bank of Italy v. Johnson, 200 Cal. 1, 251 P. 784, 789, and recognized the principle herein discussed as follows:

" 'The Legislature has not attempted to define the phrase "public convenience and advantage," nor has it attempted to declare where or how or under what circumstances the public convenience and advantage would or would not be promoted by the opening of a branch bank in a particular case. The obvious reason for the omission to define the phrase is because it would seem to be impossible to define it so that the definition would comprehend every variety and set of circumstances surrounding each particular application. * * * The phrase would seem to be as difficult of definition as "police power," "public convenience and necessity," "due diligence," or "probable cause," as those expressions are used in our law. But the impossibilities of definition do not detract in the least from the necessity of undertaking the task and of ascertaining the facts in each case, and it is for the superintendent of banks to so proceed and to ascertain them in the exercise of his power. In that exercise he performs an executive or administrative function.' "

A review of the records shows ample credible evidence to justify the refusal of the Board to grant the application. It can also be said that there is evidence that would have justified the granting of the application. But, taking the evidence of the applicants at its best it only demonstrated convenience as to distances, desirability for the community, but a borderline market economically, and hardly a "necessity" even in the mildest definition of such word. Opposed to this was opinion evidence of a variety of opponent's witnesses. To detail the evidence is unnecessary.

In Fulmer v. Board of Railroad Commissioners, supra, 96 Mont. at 39, 28 P.2d at 855, in speaking of the function of the reviewing court in connection with orders of the Board of Railroad Commissioners, this Court said:

"It must not be understood that the courts have no function at all in such matters. Such a view would nullify the statutory provisions for a judicial review of the action of the board. The courts have a measure of judicial authority in matters such as the one under consideration. The law specifically authorizes such review of the acts of the board. The review, however, has been held by this court to include only the following questions: (1) Did the board act beyond the power which it could constitutionally exercise? (2) Did the board act beyond its statutory power? and (3) Did the board base its action upon a mistake of law? This court has qualified the above rule by the following language: 'But questions of fact may be involved in the determination of questions of law, so that an order, regular on its face, may be set aside if it appears that the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or if the Commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it; or if the authority therein involved has been executed in such an unreasonable manner as to cause it to be within the elementary rule that substance, and not the shadow, determines the validity of the exercise of the power.' Billings Utility Co. v. Public Service Commission, supra [62 Mont. 21, 203 P. 366].

"The function of the court in these matters should not be minimized. Without some supervision, efficiency would often be sacrificed to expediency, and administration would be lacking in uniformity and equity. It is a fundamental fact that great enterprises, both governmental and private, must proceed regularly and impartially. They will seldom do so automatically. While this court cannot function for the board, it can require that it proceed in reasonable accord with statutory requirements and established principles of practice." And see Bacus v. Lake County, 139 Mont. 69, 354 P.2d 1056; Jordan v. Craighead, 114 Mont. 337, 136 P.2d 526.

None of the reasons advanced by the lower court in its opinion bring this case within the rules allowing the court to evade the discretionary decision of the Commission. One point that seemed to bother the district court was that evidence was introduced pertaining to markets outside of Montana. Nowhere is there a limitation in the statutes on such evidence so far as convenience and necessity are concerned. It only has effect so far as the *effect on existing markets* in the state are concerned, and, as we remarked before, the Commission did not rely on this factor. In addition, for any intelligent discussion of the marketing problems of the area some evidence had to be introduced and was introduced by witnesses for the applicant as well as the protestants. We fail to see how this could prejudice the applicants. Additionally the district court in its opinion remarked upon what it considered erroneous rulings by the Commission's counsel and the fact that in addition to ruling on procedure and evidentiary matters, the Commission's counsel did some of the questioning on behalf of the Commission. We have looked through the entire record and can find no discriminatory tactics on the part of counsel. The record reveals an attempt by the Commission to get all the pertinent facts. They allowed a very full range of discussion by both the applicant's witnesses and the opponent's witnesses in all three hearings and gave complete opportunity for all pertinent evidence to be considered.

The statutes confer, whether wisely or unwisely, the original discretion in the Commission. Such Commission is made up, presumptively at least, of men of experience in the field regulated, and when their discretion is exercised based upon substantial evidence, as it was here, that discretion should not be interfered with by the courts.

For the foregoing reasons, the judgment of the district court is reversed and the cause remanded for the entry of a judgment of dismissal of the appeal of the respondent Baker Sales Barn, Inc.

MR. CHIEF JUSTICE JAMES T. HARRISON concurs.

MR. JUSTICE DOYLE specially concurring:

I concur in the final result of Mr. Justice Castles' opinion as I have no alternative. The trial court and Mr. Justice Adair both ignore the credible testimony before the Commission, all of which is a part of the voluminous record herein.

However, if it were possible to do so, I would reverse the trial court and remand the matter to the Montana Livestock Commission for further hearing on the very narrow question of necessity and would require the Commission to confine their inquiry to the State of Montana only and to a 200 mile radius of Baker, Fallon County, Montana. I am cognizant that as this appeal is presented to us, we are not at liberty to make such an order.

The first application of the Baker Sales Barn is dated June 16, 1958. It is now November 1961, and three and one-half years have passed. This writer has no factual knowledge of the conditions now existing but it is certainly within the realm of possibility that the conditions have changed insofar as the facts anent the several applications are concerned. I believe a new application is now indicated and that there should be a new hearing held by the Montana Livestock Commission that would fairly, devoid of partisanship and in conformity with the accepted rules of legal procedure, be had.

The Commission should carefully consider only the pertinent statutes which provide legislative guide-lines for the granting or the refusal of a certificate for a sales yard. The instant cause is a borderline case. In my opinion there was credible evidence either to grant a certificate of convenience and necessity, or to reject the application. I believe under our free enterprise system, where as here, the applicants are willing to invest a substantial sum of money in a business venture with a possible opportunity of making a success of such endeavor (and without harm to other existing livestock sales markets)

that the Montana Livestock Commission would be wise to grant such an application, thus absolving itself from any implication of aiding an alleged monopoly. However, within the legal restrictions placed on this court, we are not in the position to substitute our judgment for that of the Livestock Commission. I do express my sincere distaste for any arbitrary legislation which stifles opportunity, initiative, and boldness in a venture that, if successful, would be an addition to a progressive community such as Baker, Fallon County, Montana.

MR. JUSTICE JOHN C. HARRISON dissenting:

I think the judgment of the trial court should be affirmed.

I concur with the majority that the district judge erred in declaring the appellate section of section 46-917, R.C.M.1947, unconstitutional. However, I think the trial court had sufficient evidence before it on which to base its conclusion that the Board abused its discretion in denying the application of Baker Sales Barn, Inc., and it failed to act according to law.

I see no necessity of reviewing all the evidence in the record. It is sufficient to point out that it appears from the record that Fallon and Carter Counties, the service area of the proposed market, marketed 46,780 head of cattle in 1957. Out of this number only 3,529 head were marketed at Glendive and Miles City, the two points where the principal opposition appears. This is less than eight percent of the total number of cattle marketed from these two counties. It follows that the Miles City and Glendive markets do not render service to Fallon County and Carter County and would not be substantially affected if they lost this eight percent and the operator of the Miles City market so admitted, so far as the Miles City market is concerned. Aside from that there was no showing that these two markets would lose this eight percent if a market were established at Baker.

I also think the Commission acted beyond its authority when it ruled that the number of cattle from the serviceable

area are insufficient to support and sustain an economically sound market at Baker. The statute does not in terms give the Board authority to consider that question.

Proponents of the Baker market are willing and able to back their judgment with cash, whereas those who prophesy failure are merely making a guess. I think Judge Flachsenhar had ample evidence before him to overturn the decision of the Commission and that the judgment of the district court should be affirmed.

MR. JUSTICE ADAIR:

I dissent. By denying the respondent, Baker Sales Barn, Inc.'s application for a certificate of public convenience and necessity, the appellant, Montana Livestock Commission, abused its discretion and failed to act according to law.

Section 46-909, R.C.M.1947, quoted by the majority, in effect provides that the Commission "shall" issue a certificate of public convenience and necessity if it finds "from the evidence that public convenience and necessity require the authorization of the proposed livestock market." So reads the first sentence of that section. The next provision is intended as a guide for the Livestock Commission in determining public convenience and necessity and it directs that, in passing upon an application, the Commission shall consider (1) "the service rendered by other existing livestock markets in the state"; (2) "the effect upon them [the other existing livestock markets] if the proposed livestock market is authorized"; and, (3) "the likelihood of the proposed service being permanent and continuous throughout twelve (12) months of the year."

First: Taking these step by step, we will consider the service rendered by other existing livestock markets in the state. At the time of the hearings herein, there were fourteen livestock markets in Montana. These were located at Hamilton, Missoula, Great Falls, Havre, Glasgow, Butte, Bozeman, Lewis-

town, Miles City, Glendive, Sidney, Shelby and two at Billings. However, only two of the fourteen markets can be considered as being available to the livestock producers operating in the Baker area, namely, the market at Glendive, and the one at Miles City, both of which are approximately eighty miles from Baker.

Carter County and over half of Fallon County lie south of Baker and at a considerable distance from both the Glendive and the Miles City markets. Ekalaka, the county seat of Carter County, lies approximately thirty-six miles south of Baker on Highway No. 7. Ekalaka has no railroad. Its nearest railroad is at Baker, which is serviced by the Chicago, Milwaukee and St. Paul Railroad. Carter County proper extends some seventy miles to the south of Ekalaka, hence, livestock producers from the Ekalaka area would be required to travel from 115 to 185 miles to reach the markets at Glendive and Miles City, depending on the location of the producer's ranch. Livestock producers operating in the east and southeast portions of Fallon County would be required to travel from 90 to 110 miles to reach either the Glendive or Miles City markets.

The evidence shows that of the 46,780 head of cattle marketed from Fallon and Carter counties in 1957, only 3,529 (or less than eight percent) went to the Miles City and Glendive markets. It is obvious that these two markets were not rendering adequate service to livestock producers operating in the Fallon and Carter County areas. According to the testimony this situation was due to the great distances the livestock producers in Fallon and Carter counties were required to travel to reach a market.

Second: What effect would it have upon the presently available markets if a market were established at Baker? Since the evidence shows that the Miles City and Glendive markets together were receiving less than eight percent of the cattle marketed from Fallon and Carter counties, it is clear that ninety-two percent of the livestock produced in these two coun-

ties went to other markets. There is likewise no evidence indicating that the Miles City and Glendive markets will not continue to enjoy the same percentage of the Fallon and Carter County livestock business that has come to them in the past.

Of the 3,529 head of cattle going to Miles City and Glendive in 1957, all but approximately 600 went to Miles City. The record shows that the operator of the Miles City livestock auction market, as a protesting witness, admitted that the loss of all the approximately 2,900 head of cattle from Fallon and Carter counties would have no material effect on the operation of the Miles City auction. Similarly, the record shows that a witness representing the Glendive market admitted that the proposed market at Baker would not materially affect the Glendive market.

The operator of the Sidney market, the next nearest market (approximately 133 miles from Baker), also admitted that a market at Baker should have no material effect on the operation at Sidney. The figures introduced at the various hearings indicate *no* movement of cattle from Fallon and Carter counties to the Sidney market.

Third: The statute requires that the Commission shall give due consideration to the likelihood of the proposed service being permanent and continuous throughout twelve months of the year. There is no evidence in the record to indicate that a market at Baker would not operate on a twelve month per year basis. In fact, the testimony of the officers of the respondent, Baker Sales Barn, Inc., as well as that of the witness, Kenneth Thompson, under whose management the Baker market would be placed, all show that the Baker market would be a full-time operation. The respondent, Baker Sales Barn, Inc., is well aware that its market, when established, would have to be a full-time operation or that it would face the possibility of being closed by order of the Commission.

The evidence further shows that, in the event a certificate

and license is granted, an expenditure in excess of $75,000 would be made by the respondent, Baker Sales Barn, Inc., in establishing a market at Baker. It does not appear to be at all probable that the respondent, Baker Sales Barn, Inc., would make such an investment if it anticipated only a part-time operation.

Permanent and continuous service throughout twelve months of the year, within the meaning of R.C.M.1947, § 46-909, does not require that there must be a sale in each and all of the fifty-two weeks of each year. The statute merely contemplates that throughout the year sales will be had and conducted with reasonable regularity and without *substantial* interruption.

It is common knowledge that all of Montana's livestock markets are subject to both rush and slack seasons. All sell more livestock during the rush season than during a slack season. However, these markets are still considered to be operating permanently and continuously throughout the year. It is clear from the evidence introduced before the Commission that the service of the proposed market at Baker would be permanent and continuous throughout twelve months of the year, and therefore in compliance with the requirements of the statute.

The last provision of section 46-909, supra, requires: (1) a showing that revenue from inspection fees will be equal to at least seventy-five percent of the cost of maintaining a resident livestock inspector at the proposed market; or, in lieu thereof, (2) a bond guaranteeing the payment of such minimum revenue.

The appellant Commission in denying respondent's (Baker Sales Barn, Inc.) application listed among its findings of fact, the following:

"(3) That the revenue derived from inspection fees will be less than seventy-five percent (75%) of the cost to the State in maintaining a resident livestock inspector at the proposed market."

The evidence fails to sustain the above-quoted finding. The

evidence is to the effect that pursuant to and in compliance with the plain provisions of section 46-909, the respondent, Baker Sales Barn, Inc., repeatedly assured the Commission of both its ability and willingness to furnish either a bond guaranteeing the payment of such minimum revenue or to supply any other bond that the Commission should require.

In my opinion, the Commission acted beyond and in excess of its authority: (1) in its determination of the effect and influence which a modest livestock market located at Baker would have on the markets *outside* the state of Montana; and, (2) in ruling that there would not be a sufficient number of cattle from the area to be served by the Baker market to support and sustain an economically sound market there.

The evidence clearly shows that the proponents of the Baker market at all times have been anxious, ready, willing, and fully able to back their judgment and proposed market with cash, while those who prophesy failure for the project apparently rest their arguments upon conjecture and a defeatist attitude. In my view, the district court had ample evidence before it to warrant its decision and order reversing the Commission for which reason I would affirm the decision and order of the district court.