The STATE OF MONTANA on relation of the STATE BOARD OF EQUALIZATION and DAN FULTON, JOHN C. ALLEY and J. MORLEY COOPER as members of and Constituting the State Board of Equalization, Relators, *v.* HELEN KOVICH, as County Clerk and Recorder of the County of Lewis and Clark, WILLIAM O. OSBORNE, as County Assessor of the County of Lewis and Clark, The Board of County Commissioners of Lewis and Clark County, and Harry F. Byrne, Edward F. Lamb and Al Gaskill as members of and Constituting the Board of County Commissioners of Lewis and Clark County, Respondents.

No. 10592
Submitted May 20, 1963. Decided July 12, 1963.
383 P.2d 818.

202

John R. Kline (argued orally), Helena, for relators.

William Crowley (argued orally), Helena, for respondents.

Wm. J. Speare, County Atty., Billings, Gordon T. White, County Atty., Glasgow, Tom Darland, County Atty., Plentywood, Jordan A. Fosland, County Atty., Scobey, Paul J. Murphy, County Atty., Stanford, Allen LeMieux, County Atty., Boulder, Dan S. Welch, County Atty., Cut Bank, Dola N. Wilson, Jr., County Atty., Chester, Rae V. Kalbfleisch, County Atty., Shelby, William B. Sherman, County Atty., Conrad, Willis M. McKeon, County Atty., Malta, J. Chan Ettien, Deputy County Atty., Havre, and Oscar Hendrickson, County Atty., Chinook, argued orally for those petitioning to be entered as intervenors and respondents; Keith L. Burrowes, County Atty., Wolf Point, Charles D. Wahl, County Atty., Glendive, Denzil R. Young, Jr., County Atty., Baker, Victor G. Koch, County Atty., Sidney, and Thomas M. Ask, County Atty., Roundup, appeared.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an original proceeding. The relators are the State Board of Equalization and will be referred to as the State Board. The respondents are the Clerk and Recorder, Assessor, and Board of County Commissioners of Lewis and Clark County.

The State Board filed a petition seeking a writ of mandamus to compel the elected officials of Lewis and Clark County to enter on the assessment books certain values ordered by the State Board. This court issued an alternative writ, and on May

20, 1963, respondents appeared by a motion to quash, and sought leave of court to further answer if the motion to quash be denied.

We shall narrate the situation giving rise to this proceeding as briefly as possible.

Chapter 191, Laws of 1957, codified as sections 84-429.7 through 84-429.13, made it the duty of the boards of county commissioners to "in such manner as the state board of equalization may direct [accomplish]:

"a. The classification of all taxable lands.

"b. The appraisal of all taxable city and town lots.

"c. The appraisal of all taxable rural and urban improvements." (R.C.M.1947, § 84-429.7)

The state board's duties under the Act were to "implement the provisions of this act by providing:

"1. For a general and uniform method of classifying lands in the state of Montana for the purpose of securing an equitable and uniform basis of assessment of said lands for taxation purposes. * * *

"2. For a general and uniform method of appraising city and town lots.

"3. For a general and uniform method of appraising rural and urban improvements.

"4. For a general and uniform method of appraising timber lands." (R.C.M.1947, § 84-429.12)

Section 84-429.9 provided that the assessors must base assessments of all lands on the classifications as made.

All of this was to be done within five years after the effective date of the act.

In 1957, the State Board put forth its procedures and instructions for land reclassification. It appears from the petition of the State Board that all counties have proceeded to "classify" the lands according to its instructions. However, in March of 1963, some six years after the effective date of the act, the State Board found that twenty-two counties had not

completed the classification work; although they all have accomplished part of it.

Of the thirty-four counties who have completed it, the values assigned to each class of property is different. It is this difference in *values* assigned each class of property that gives rise to this proceeding. Eight counties are using values assigned by the State Board. Twenty-six counties are using values worked out by themselves through a committee of the county commissioners and county assessors' associations; and two counties are using neither value as described above.

Respondents are one of the twenty-six counties using values not approved by the State Board. The State Board here seeks against one county, to accomplish its purpose of having all thirty-four counties who have finished reclassification, use the same values in assessments. (Of course, this leaves twenty-two counties out the the "uniformity" drive presently.)

During the intervening years since 1957 the counties worked towards the goal of uniform assessment of lands between and among the fifty-six counties. In June of 1962 these efforts culminated in an agreement by most counties on a set of values to be used.

However, on September 24, 1962, the State Board issued a directive with an accompanying letter to all county assessors and all county commissioners setting forth values for certain lands including non-irrigated farm lands, grazing lands and wild hay lands and directing that these values be used by each assessor on the grades and classes of land involved. Again in November 1962, the State Board reiterated its directions as to values. Again in December the State Board addressed another letter to assessors directing the use of values contained in the September 24 directive. Then in March 1963, the State Board sent out a questionnaire to all fifty-six counties to determine whether classification had been accomplished, and if so, what valuations were being used by each county for non-irrigated continuously cropped lands.

Following the returns to the questionnaire, and pursuant to R.C.M.1947, § 84-710, the State Board notified county commissioners of the twenty-six counties referred to above as having completed their classification that "hearings" would be held because the State Board contemplated changes in values and that three hearings, one in Billings, one in Glasgow and one in Helena would be held with county commissioners from the counties involved divided somewhat geographically.

Following these three "hearings" which will be discussed later, on April 19, 1963, the State Board ordered the officials of the twenty-six counties to change their valuations to those previously ordered by the State Board on September 24, 1962.

It appearing that the twenty-six counties were not going to change their valuations to those ordered by the State Board, the Board brought this action as an original proceeding before this court against Lewis and Clark County officials, it being the State Board's hope that one action would resolve all problems as against all the counties involved.

As recited previously, Lewis and Clark County appeared by a motion to quash. Also eighteen other counties have petitioned this court for permission to intervene. As will hereafter appear, these petitions for intervention are denied as being moot.

We shall consider the motion to quash. It is made on these grounds:

1. The petition fails to state facts sufficient to justify relief.
2. Impossibility of performance.
3. Fact situations not properly before the court.

The first of these grounds is determinative here, and we shall discuss it.

The State Board's position is simply that, whether right or wrong, its power is "dictatorial" or that it is "omnipotent" in the area of taxation or that county officials are mere "clerks" or "ministerial officers" and thus subject to the State Board's orders. All of the foregoing quoted descriptions were used during oral arguments.

The Montana Constitution, Art. XII, § 15, provides in part as follows:

"Sec. 15. The board of county commissioners of each county shall constitute the county board of equalization. The duties of such board shall be to adjust and equalize the valuation of taxable property within their respective counties, and all such adjustments and equalizations may be supervised, reviewed, changed, increased or decreased by the state board of equalization. * * * The state board of equalization shall adjust and equalize the valuation of taxable property among the several counties, and the different classes of taxable property in any county and in the several counties and between individual taxpayers; supervise and review the acts of the county assessors and county boards of equalization; change, increase, or decrease valuations made by county assessors or equalized by county boards of equalization; and exercise such authority and do all things necessary to secure a fair, just and equitable valuation of all taxable property among counties, between the different classes of property, and between individual taxpayers. Said state board of equalization shall also have such other powers, and perform such other duties relating to taxation as may be prescribed by law."

That this provision grants broad powers to the State Board is apparent from its language. In State ex rel. Schoonover v. Stewart, 89 Mont. 257, 269, 297 P. 476, 479, this court after observing that, "More comprehensive words could hardly have been chosen to express the intention of the people to confer upon the state board broad and far-reaching power in matters relating to taxation" went on to say:

"As clear as are the broad powers expressly granted to the state board, an implied, though definite, restriction is equally clear; the board shall not intentionally discriminate in favor of one county and against another, or between the different classes of property in any county, or in favor of one individual against another."

██ This court has uniformly held that the State Board's actions, if arbitrary, fraudulent, or contrary to law, are void and will be so declared by the courts. (State v. State Board of Equalization, 56 Mont. 413, 185 P. 708, 186 P. 697; Johnson v. Johnson, 92 Mont. 512, 15 P.2d 842; State ex rel. Reid v. District Court, 134 Mont. 128, 328 P.2d 634.)

In the latter case above, State ex rel. Reid, this court dissolved an injunction so that the State Board might carry out its duties by holding a hearing to determine whether or not to adjust, increase and equalize the valuations to bring about uniformity of tax burdens in the county and on a statewide basis.

In Johnson v. Johnson, supra, 92 Mont. at p. 520, 15 P.2d at p. 845, this court said:

"However, a hearing on objections to the assessment of property is necessary in order to constitute due process of law. (3 Cooley on Taxation, [3d Ed.] §§ 1113, 1114; Hagar v. Reclamation District, 111 U.S. 701, 4 S.Ct. 663, 28 L.Ed. 569. And while the hearing may be informal, the taxpayer must be given an opportunity to produce proof of, and the board must render its honest judgment based upon evidence before it. Where a hearing is a mere form, there is no due process. 3 Cooley, above, § 1116; Londoner v. City and County of Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103. A presumption of correct action will give prima facie support to the board's conclusions, but this presumption is not conclusive in any case. 3 Cooley, above, § 1229."

We realize that the cases previously alluded to have to do with taxpayers as such and not with county officials as here.

██ But, the Legislature has set forth certain procedures which we believe require due process as regards county officials, even as our opinions have recognized due process as regards individual taxpayers.

R.C.M.1947, § 84-710, provides in part:

"When the state board of equalization shall contemplate raising or lowering the assessed valuation of any one or more classes

of property in any county, it shall give notice of its contemplated action to the board of county commissioners of the county in which such class or classes of property is situated, in such manner as it shall deem proper and sufficient, and shall fix a time and place within the county in which such change of assessment is proposed for a hearing thereon; provided, however, that if the change affects one or more classes of property common to more than one county the board shall fix the time and place of hearing so as to accommodate the counties interested. At the time and place fixed for such hearing any taxpayer or any officer of any municipal corporation interested therein may appear and be heard."

This section, enacted in 1923, is modified by section 84-605, enacted ten years later, which provides:

"The state board of equalization shall not be authorized to raise the value of any class of property in any county until after a public hearing in said county and on evidence received at said hearing and shall have no authority to raise the value of any class of property higher than the actual value established by testimony adduced at such hearing."

Section 84-710, R.C.M.1947, provides for a hearing in case of *any* contemplated change in assessments. Section 84-605, refers only to those situations where the contemplated change is an *increase*. However, the requirement that the hearing be a bona fide investigation into the merits of the proposed change is common to both sections.

Returning now to the "hearings" held by the State Board in Billings, Glasgow, and Helena during the month of April 1963, the hearings, according to the notices, were held pursuant to R.C.M.1947, § 84-710, previously quoted. No hearings had preceded the fixing of valuations in the order of September 24, 1962. In the order, the State Board had recited that it "received and considered recommendations and suggestions of county commissioners, county assessors, farmers, stockmen, businessmen, and agricultural representatives of loan agencies."

The "hearings" held in Billings, Glasgow, and Helena referred to above were termed by counsel for the State Board as "Show Cause Hearings" meaning that the Board had settled on the figures contained in the order of September 24, 1962, and held hearings for the purpose, not of hearing evidence, but rather to afford opportunity to protest. And, as a fact, no evidence was presented nor opportunity to cross-examine witnesses nor any other semblance of a hearing was had. No stenographic record, although requested, was made of the so-called hearings.

Now, then, the Legislative enactments previously quoted in sections 84-710 and 84-605, supra, contemplate hearings held, either as in 84-710 in *any* contemplated change in assessments or in 84-605 in contemplated *increases*. At the very least, the statutes contemplate a hearing to seek bona fide data on which the State Board might act. To require less would allow the State Board to be, as its counsel described, "omnipotent" and even above the law. Such cannot be, otherwise other constitutional guarantees such as due process, uniformity and other matters would be meaningless.

We hold then, that the motion to quash is well-taken, on ground number one, and it is hereby granted.

We observe, in passing, that ground number 2, impossibility of performance, is also well-taken at this late date.

■ We have not discussed the merits of the proposed valuations nor do we intend to. It seems obvious that conscientious, good faith, differences of opinion exist as to proper valuations. It seems obvious, too, that, for the most part, the counties generally are attempting to comply with legislative directions. The final authority, however, stands as the Constitution and statutes provide, in the State Board of Equalization, but if, and only if, the State Board proceeds in a lawful manner of providing hearings with attendant rights of due process.

Several problems raised, particularly in briefs of intervenors, have not been answered herein, and we believe an attempt

to answer each problem would only create more confusion in an already difficult problem.

Our alternative writ of mandamus directed to the elected officials of Lewis and Clark County is quashed and the matter dismissed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES JOHN CONWAY HARRISON, ADAIR and DOYLE, concur.