CASCADE COUNTY CONSUMERS ASSOCIATION, Montana Consumers Association, Montana State Florists Association, RALPH PARKER, an Individual, ARTHUR SMITH, an Individual, and LLOYD C. WENNER, an Individual, Plaintiffs and Respondents, v. PUBLIC SERVICE COMMISSION of Montana, PAUL T. SMITH, JACK HOLMES and LOUIS G. BOEDECKER, as members thereof and constituting said Public Service Commission of Montana, and the Montana Power Company, a Corporation, Defendants and Appellants.

No. 10610

Submitted December 10, 1963. Decided August 19, 1964.
Rehearing denied September 9, 1964.
394 P2d 856.

170

William P. Mufich (argued), Helena, Sam B. Chase, Jr., J. J. Burke, Jr., and William H. Coldiron, Butte, John H. Weaver, Great Falls, Robert D. Corette (argued), Sam B. Chase, Jr., Butte (argued), for appellants.

Leo C. Graybill, Jr., (argued), P. J. Gilfeather, Great Falls, (argued), C. W. Leaphart, Helena, (argued), for respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal by the defendants and appellants, the Public Service Commission of Montana, and The Montana Power Company, from a judgment of the district court of the eighth judicial district, the Honorable Paul G. Hatfield, Judge presiding, which set aside and reversed an order of the appellant Commission as being unlawful and not based on sufficient evidence.

In April 1961, the appellant Montana Power Company, filed a petition with the Montana Public Service Commission for authority to increase rates and charges, with a price adjustment clause, for natural gas service within the State of Montana. The petition alleged the following:

(1) Petitioner had been a distributor of natural gas in Montana since 1931;

(2) That only one increase had been granted petitioner since 1931, and that was in 1953;

(3) That in 1954 petitioner had acquired the natural gas system of The Montana-Dakota Utilities Company in the Hi-Line area of Montana;

(4) That present rates and charges are insufficient to produce a fair, reasonable and proper return to the Company because of wage increases and benefits, increased costs of materials and supplies and equipment of all kinds, and increased taxes;

(5) Petitioner further alleges that due to the continuing and increasing demand for natural gas that large expenditures are required for replacements, property and improvements, also that additional gas reserves are required to supply present and future customers, and that in order to assure an adequate supply the Company was required to and did obtain additional reserves from the Province of Alberta;

(6) That the obligations and expense imposed on the Company for said additional natural gas will sharply increase the Company's cost of doing business in Montana;

(7) The petition further requested the Commission to approve new rates for natural gas service to the Great Falls Gas Company for an interim period to January 1, 1967; and

(8) The petition requested a uniform rate for its entire system, declaring that a zoned rate was undesirable, however, it asked for special industrial and city gas rates for some large users.

To this petition of the appellant Company, a multitude of protests were filed. Included were the respondents in this action. One month after appellant filed its petition the Commission set the first of the two hearings. The first hearing was held in Helena, Montana, on May 23, 24, 1961, for the purpose of allowing appellant Montana Power Company to present its case in chief. On July 18, 1961, the hearing was reconvened in Butte, Montana, for the purpose of cross-examination of appellant Company's witnesses and for the presentation of protestants' evidence and for Montana Power's rebuttal. This portion of the hearing took from July 18 to August 2, 1961, and the major portion of the 2,900 pages of testimony was produced during this period.

The entire fiscal production, transmission and policy operations were explored by all interested parties at the Board hearing.

It was contended by the appellant Company that in conformity with the generally agreed policy throughout the country that a fair rate of return is in the neighborhood of six percent. The appellant Commission agreed that six percent was what they strived for in their order. The testimony produced by the expert fiscal witness, Mr. Woy was to the effect that in 1960 they earned a return in the gas portion of the business of 3.54 percent figured on the reproduction cost less depreciation theory of figuring rates; 5.28 percent on the original cost theory; 7.30 percent on original cost less depreciation; but only 4.49 percent on his estimate of fair value of the system; and that if the Commission would grant the increase, in 1962 they would earn 6.07 percent.

W. C. Gilman, a fiscal expert employed by The Montana Power Company, testified that a fair rate of return for Montana Power gas properties should be 6.75 percent.

Dr. L. S. Knappen, the fiscal expert of protestants, in his testimony criticized the 6.75 percent figure of Mr. Gilman, pointing out that it was based on 161.07 percent of book value of the common stock and would amount to a 20.79 percent of its 1960 book value, or 20.28 percent of its 1962 book value. He stated that based on Mr. Woy's figures, The Montana Power Company was earning more than 6 percent on every one of the functions, as set forth separately, i. e., production, transmission, and distribution.

Mr. John W. Kushing, fiscal expert of the Commission, testified that he recommended 5.96 percent as a reasonable return on fair value.

Throughout the testimony some difficulty was evidenced in separating the multiple functions of the Company which break down basically to 67 percent electrical and 33 percent gas. In this respect The Montana Power Company is unique

among privately owned public utilities. Both the Commission and the District Court seem to have had difficulty in properly separating the figures given and relating them to the gas rate only. Evidence of rates of return on the whole Company's gas and electricity ran from 8.3 percent up to 9.3 precent making this private utility company one of the high income utilities.

Evidence given showed that the value of the stock in The Montana Power Company increased five times in the years 1950-60.

Testimony revealed that well over $100,000 is spent yearly in advertising, raising a question of how much spent in this field by a company, with a franchise that serviced two-thirds of the State of Montana, is reasonable and beneficial to the rate payer. However, the amount did not shock the conscience of the Commission so neither the District Court nor this court has the matter on appeal.

Montana Power Company spends about 7.00 percent of their money on interest.

Prior to getting Canadian gas, the Company paid independent Montana producers 5.7 cents per cubic foot or less as against about 24 cents for the Canadian gas although the Company did say recently it had increased its offer for Montana gas.

Testimony given by the Company, and approved by the Commission, provided for a uniform rate for the entire system, as against a zone rate.

Concerning taxes paid by the Company it was shown that of the increase requested that some 54 percent of the additional revenue collected would be paid by The Montana Power Company into federal, state and local treasuries.

Certain facts concerning the gas supply and reserves were testified to during these hearings, that are of import to this case in view of the allegations made by the protestants at the Board meeting and denials by the petitioners (now appellants) as to the necessity of The Montana Power Company's securing Canadian gas.

The protestants infer that Montana, particularly the area north and northwest of Great Falls, is a great undeveloped gas area and that if The Montana Power Company would pay enough for the gas when found in sufficient quantities to make it profitable, reserves would be found. The Company denied that the price paid by them is the limiting factor, but alleges that discoveries of the quantity of gas found in Canada just have not happened in Montana in spite of considerable exploration both by Montana Power and other interested groups.

Further, that in Montana over a period of nine years, 1951-60, the records show that 11.5 dry holes occur for every producer. While in contrast Alberta has one producer for each 3.6 holes drilled; North Dakota, one producer for each 7.7 holes drilled; and Wyoming 1 to 7. Too, the Company alleges that with an increase in consumption during the past ten years they were running short of reserves and that it was absolutely necessary to get into Canada when they did in order to secure adequate reserves.

The Board hearing revealed that in 1954 the Company purchased from the Montana-Dakota Utilities all of its properties north of Great Falls and as far east as Fort Belknap. This purchase included the contract to serve the Great Falls Gas Company .

In addition to the northern area, testimony revealed three other sources of supply and reserve servicing the Company; purchase from the Montana-Dakota Utilities in south central Montana of gas from Wyoming, the Dry Creek field in Montana, and the unconnected part of the system serviced by the Big Coulee field built in 1955 to service central Montana.

Prior to 1950, The Montana Power operated exclusively in the United States, but in that year they went into Alberta for the purpose of developing additional gas in the Pakowki Lake area just north of Montana. The Company contends that even with the Pakowki Lake Reserves they would have been unable

to supply the annual requirements of customers beginning in 1963.

The Company testified that as a result of their going into Canada early, and being the first to import gas out of Canada, that they were allowed to join with The Pacific Gas and Electric Company in 1959 to import some thirty million feet of gas per day which amounts to 10,920,000,000 cubic feet per year at a price of 24 cents per thousand cubic feet or at a cost of $209,000 per month maximum, or if taken at 90 percent load factor in the amount of $188,000 per month. The Company alleges that in such amounts they have secured an adequate reserve for Montana's immediate needs. The Canadian gas is purchased from The Alberta-Southern Gas Company which pays the Alberta producer and the transportation costs of said gas to a point some four miles north of the United States border. There it is delivered to the Canadian-Montana Pipe Line Company, an exporting company, which transports the gas four miles to The Montana Power Company line at the border. The Canadian-Montana Pipe Line Company is paid a transportation cost for the four mile trip and is a wholly owned subsidiary of Montana Power Company. In order to get this gas from the border into its system, the Company had to build some 56 miles of 16 inch pipe from the border to Cut Bank at a cost of $2,565,914.

In addition to testimony on the Canadian gas purchases the appellant Company testified on additional costs made necessary due to their storage projects. The Canadian contract, calling for a 90 percent load factor, necessitated additional storage because the Company had to take at least 90 percent of the daily contract. So one new storage area was added in the Deer Lodge Valley to the other storage areas in Madison County, Shelby, Cut Bank and Box Elder.

The respondents contended at the Board hearings and on appeal to the district court that the Company failed either in its petition to allege or at the hearings to show:

(1) Sufficient evidence to show the actual amounts it spent for the periods testified to or for the test year, and that there was insufficient showing of original costs;

(2) No competent evidence from which the actual value of Company's gas reserves could be determined, and that the methods used for determining gas reserves were unreasonable and arbitrary;

(3) Property not actually used to serve customers was used to determine the rate base;

(4) Public Service Commission improperly used "cost of capital" basis for determining rates; and

(5) Improper meeting held between the appellants (Montana Power Company officials and commissioner's) on October 4.

At the close of the evidence, counsel for the respondents moved the Commission to:

(1) "Order an independent audit in accounting of the Company's books and records to reflect a new-reproduction-cost study"; and

(2) "For an accounting to establish an original cost basis; and that the whole problem of the (gas) leases * * * should be looked into * * * to determine what should be included in certain accounts;" and further stated "I think it is going to take an accounting to determine what should be in there, so I would like to make that as a further motion."

Such an independent audit and accounting was immediately made by employees of the Commission which took several weeks to complete.

On October 4, 1961, at Helena, officials and experts of The Montana Power Company, together with the Company counsel made an appearance before at least two members of the Commission. They were summoned by the Commission or a member or members thereof to clarify certain matters having to do with the inter-relationship of the return on Montana property and Canadian property and the effect upon income taxes

resulting from this. Neither the respondents nor their counsel were notified of this meeting, nor were any records kept as to what was said.

Upon learning of this October 4th meeting, the respondents on October 27, 1961, filed a petition to reopen the matter for further hearing. This petition was based on an affidavit alleging the meeting of October 4. The petition requested that the Commission suspend all further proceedings in the matter and that further hearing be held for the purpose of examining witnesses of The Montana Power Company and to allow the protestants to present additional evidence. A ruling on this motion was taken under advisement by the appellant Commission.

The Commission on February 2, 1962, issued its Order No. 2897 which fixed rates and charges for natural gas service by Montana Power. The appellant Commission dismissed the motion for further hearing made on October 27 and stated:

"The purpose of the informal meeting was a part of the Commission's independent investigation of matters on which the members of the Commission wanted to become more fully informed within the meaning of the statutes supra."

The appellant Commission referred to R.C.M.1947, § 70-104, as authority for the informal hearing. This statute authorizes the Commission to adopt proper rules and regulations relative to audits, investigations and hearings. Rule 3.7 of the Commission reads:

"The Board (Commission) reserves the right to conduct any independent investigation either before or after hearing to the end that it may be fully informed."

On February 16, 1962, respondents and four other protestants filed with the Commission a Petition for Rehearing, to which The Montana Power Company filed objections. A week later the Commission on February 23 issued Order No. 2897—A which denied the Petition for Rehearing and "after re-considering all of the evidence introduced by all parties at the hearing held in this Docket and the briefs of the parties heretofore filed" re-

affirmed Order No. 2897 "except the rate schedule for the Great Falls Gas Company" which it modified in certain particulars not involved in this appeal.

The respondents then, on April 27, 1962, filed a complaint in the district court below to set aside Order No. 2897 as unlawful, unreasonable, discriminatory and unjust. Both defendants filed answers and a certified copy of the Record of Proceedings held and testimony taken before the Commission was certified to the District Court. Following a pre-trial conference the lower court made a Pre-trial order dated July 27, 1962.

Hearings commenced in the District Court before Judge Hatfield on August 15, 1962, and were continued to and concluded on September 5.

At the conclusion of the appeal before Judge Hatfield, the court ordered the testimony of the hearings had before the court transcribed and submitted to the appellant Commission, as required by section 70-128, subd. (3), R.C.M.1947. The appellant Commission on October 10, 1962, in a Supplemental Order No. 2897-B ratified and affirmed its previous orders 2897 and 2897-A.

On April 26, 1963, Judge Hatfield, the presiding Judge made a lengthy order wherein he reviewed the facts and the law and set aside and reversed as being unlawful and not based on sufficient evidence the orders of the appellant Commission. On June 3, 1963, he signed his Findings of Facts and Conclusions of Law and on the same day signed a judgment against appellant Commission. Said judgment went to the appellant's Orders 2897 and 2897-A.

In addition to the hearing on the above two orders heard by Judge Hatfield, the appellant Commission, heard testimony from which an action resulted in Blaine County entitled "McCartney, Johnson, Anderson, Vita Rich and Havre Laundry and Hi-Line Gas Consumers Assn. v. Public Service Commission, Cause No. 6143. Upon the disqualification of Judge Elwell in that matter, Judge Frank Haswell assumed jurisdiction.

He heard the parties on September 20, 1962, having delayed a previous setting of the case on August 20, 1962, in order to have a transcript of the case heard in Cascade County by Judge Hatfield. It was stipulated that Judge Haswell could examine the evidence presented before Judge Hatfield in considering this case. Judge Haswell found that the Cascade County case was different in certain respects to the one being heard by him in Blaine County. He therefore took additional testimony on the case and then transmitted his findings to the appellant Commission as provided by section 70-128, R.C.M.1947. The appellant Commission after considering this evidence returned the case to Judge Haswell reaffirming the appellant Commission and The Montana Power Company.

It should be noted that Judges Hatfield and Haswell in their separate judgments made reference to the two cases: Judge Hatfield, in paragraph IV of the judgment, said:

"That this judgment and order shall apply to the rights of the parties to this action or this action itself as distinguished from the rights of the parties to cause No. 6143 in the district court of the Twelfth Judicial District of the State of Montana, in and for the County of Blaine."

Judge Haswell found:

"That all the findings and orders of the Public Service Commission of the State of Montana contained in orders No. 2897 and 2897-A, Docket No. 4997, to the extent that all are applicable to the rights of the parties to this action itself, distinguished from the rights of the parties to cause No. 55117B in the district court of the Eighth Judicial District Court of the State of Montana, in and for the County of Cascade, are hereby affirmed."

The appellants, in a supplemental brief, contend that section 70-128, subd. (1), R.C.M.1947, providing that an interested party dissatisfied with an order of the Commission "may within ninety days commence an action *in the district court of the proper county*" contemplates that an action appealing a Com-

mission order can be brought in *but one county*. (Emphasis supplied.) Under this contention the case from Blaine County first secured jurisdiction over the appeal and the Cascade court had no jurisdiction to issue the judgment here appealed from. They cite as authority Colorado Interstate Gas Co. v. State Corporation Commission, 192 Kan. 29, 386 P.2d 288; In re Woodside-Florence Irrigation Dist., 121 Mont. 346, 194 P.2d 241; Larson v. Witmer, 124 Mont. 399, 224 P.2d 983; State ex rel. Stephens v. Keaster, 82 Mont. 126, 266 P. 387.

With this contention we hold brief. In the first place the argument is not timely due to the fact it was raised neither in the pleadings nor briefs of appellants. Secondly, neither the parties nor the facts are the same in the two cases, and no effort to consolidate the two cases was ever made. Third our statute differs from that of the Kansas case relied upon.

From the findings of fact and conclusions of law and judgment the appellant set forth some sixteen specifications of error, which are as follows:

"1. The court below erred in entering judgment in favor of Plaintiffs (Respondents) and against the Defendants (Appellants.)

"2. The court below erred in setting aside and reversing as being unlawful and not based upon sufficient legal evidence Commission Order No. 2897 of Docket No. 4997, including further rates and charges set forth in Order No. 2897-A.

"3. The court below erred in declaring the rates and charges set forth in Order No. 2897, including further rates and charges set forth in Order No. 2897-A, to be unlawful, void and of no force and effect, and in vacating and setting aside said rates.

"4. The court below erred in failing to take into account the fact that rate-making proceedings are legislative, not judicial in character.

"5. The court below erred in failing to give proper weight

to the statutory presumption that rates fixed by the Commission are prima facie lawful.

"6. The court below erred in finding that Plaintiffs were not given an opportunity to cross-examine or to argue or to introduce rebuttal evidence as to the meeting of October 4, 1961, and as to the investigation conducted by the Commission's staff.

"7. The court below erred in finding that the Commission, in valuing gas reserves, used outside information and evidence.

"8. The court below erred in finding that the Commission rejected the methods proposed by Montana Power for valuation of gas reserves and substituted a determination of value for gas reserves not supported by legal evidence in the record.

"9. The court below erred in finding that the only evidence of Reconstruction Cost New Less Depreciation valuation in the record was specifically rejected by the Commission as a basis of value.

"10. The court below erred in finding that the Commission's determination of which gas properties are used and useful was based on information obtained outside the record.

"11. The court below erred in holding that there was any denial of due process of law or any violation of the Constitution of the State of Montana or of the United States Constitution.

"12. The court below erred in stating in its Conclusion of Law No. 6 that there is no evidence in the record to substantiate the Reproduction Cost New Depreciated valuation placed by the Commission upon gas reserves and used in determining the rate base.

"13. The court below erred in assuming or inferring in its Conclusion of Law No. 5 that the Commission, in valuing gas reserves, used information and evidence obtained outside the record without a full and fair hearing and in assuming or inferring in its Conclusion of Law No. 7 that the Commission

secured or gathered evidence outside the hearing without a full and fair hearing.

"14. The court below erred in stating in its Conclusion of Law No. 8 that Order No. 2897 is based on information and purported evidence obtained outside the record and without fair hearing procedures.

"15. The court below erred in stating in its Conclusion of Law No. 9 that Order No. 2897 is based on insufficient legal evidence.

"16. The court below erred in stating in its Conclusion of Law No. 10 that the record in this case is insufficient for the Commission to determine whether or not Montana Power is receiving a fair return upon a fair value for its properties, and in assuming or inferring that the Commission used or relied upon information and evidence obtained outside the record without a full and fair hearing."

These specifications of error can be grouped into the following categories for discussion purposes concerning this case:

1. Was the October 4 meeting a denial of due process by the Commissioners and if so did the subsequent hearing before the district court change the status of the rights of the protestants with regard to this October 4 meeting?

2. Were the actions of the Commission after the hearing, in sending employees to check statements made at the hearing, a denial of due process?

3. Was sufficient evidence received at the hearings to support the Commission's orders?

4. Were the gas leasehold interests included by the Commission, as part of plant production and made a part of the rate base, a proper inclusion?

Concerning the October 4 meeting, the respondents protested and filed a petition to reopen the hearings for the purpose of examining the witnesses of the Montana Power Company, who the appellant Commission had called in to clarify certain matters relating to their Canadian properties. Demand was made

that an opportunity be afforded for explanation and rebuttal. The appellant Commission's order of February 2, 1962, rejected and denied this demand. At this point in the proceedings there was timely and adequate assertion of the infringement of respondents' rights calling for remedial action by the Commission.

We meet at the threshold of this opinion the fact that as to the request for a hearing to examine the participants, the Commission erred in not granting the respondents' petition. Whether the respondents were prejudiced by this will be discussed later.

■ The fundamentals of a fair hearing were denied the respondents when a hearing was held when respondents were not present, and when the testimony of that hearing was not spread on the record.

Here, what was done by the appellant Commission is subject to a proper objection. From the standpoint of due process, the protection of the individual against arbitrary action, a deeper vice is this, that even now we are not certain what evidentiary facts were taken by the appellant Commission or whether or not it rested any of its conclusions on said evidence. The facts of the October 4 meeting, with the exception as to who was there, are uncertain, except for what Commissioners Smith and Boedecker testified to.

The district court did not rely on the testimony of the apellant Commission as to what happened at the October 4 meeting, holding on the evidence produced before it that due process was denied respondents by the very holding of the meeting.

■■ This court has recognized that the regulatory commissions of this state are invested with broad powers within their sphere of administration authorized by the legislature. Tobacco River Power Co. v. Pub. Service Comm'n, 109 Mont. 521, 98 P.2d 886. Even in quasi-judicial proceedings their informed and expert judgment receives proper consideration

by the courts of this state when such judgment has been reached with due consideration of constitutional restraints. Baker Sales Barn, Inc. v. Montana Livestock Comm'n, 140 Mont. 1, 367 P.2d 775. Much that is done by these administrative agencies of the state, within the realm of administrative discretion, is exempt by the legislature from supervision by the courts if those restraints are obeyed. Therefore the need is great, where power has been bestowed so broadly, that the safeguard of a fair hearing be maintained in its fullest. The right to such a hearing is one of the rudiments of fair play assured every litigant by the Fourteenth Amendment to the Constitution of the United States, and section 27 of Article III, Montana Constitution, as a minimal requirement. This cannot be compromised on the altar of convenience or expediency.

This court has often spoken out against the abuse of power by state boards. In the case of State ex rel. State Board of Equalization v. Kovich, 142 Mont. 201, 383 P.2d 818, we recently said: "This court has uniformly held that the State Board's actions, if arbitrary, fraudulent, or contrary to law, are void and will be so declared by the courts." See also State ex rel. Reid v. District Court, 134 Mont. 128, 328 P.2d 634; Johnson v. Johnson, 92 Mont. 512, 15 P.2d 842.

Concerning the Industrial Accident Board's activities, two recent opinions of this court, State ex rel. Fish v. I.A.B., 139 Mont. 246, 362 P.2d 852, and Graham v. Tree Growers, Inc., 142 Mont. 483, 385 P.2d 83, we have pointed out that all administrative boards and tribunals should zealously guard against any appearance of unfairness in the conduct of their hearings. Too, we notified all such administrative agencies in these opinions that the court "will carefully review all administrative hearings to guarantee the fair conduct of their hearings."

In considering the activities of the Montana Livestock Commission, this court in Baker Sales Barn, Inc. v. Montana Livestock Comm'n, 140 Mont. 1, 9, 367 P.2d 775, stated:

"It needs no citation of authority to say that this discretionary power is not an unrestricted power. It must be based on a reasonable use of the power. The statute, section 46-909, establishes the limits of the power in as reasonable a manner as words can describe. On review provided in the district court under section 46-917 the legislature specifically left discretion in the Commission and left to the court only the duty to examine the records made before the Commission to determine whether the latter acted, 'capriciously, arbitrarily, or abused its discretion and whether it acted according to law.' That this is proper has been discussed by this court in Peterson v. Livestock Commission, 120 Mont. 140, 150, 181 P.2d 152, 157, wherein it was said:

" 'The only proper questions that may be tried by a court on appeal from an order such as the one here involved is whether the commission acted capriciously or arbitrarily or without jurisdiction or authority under the law.' "

In a number of opinions this court has considered the activities of the Montana Milk Control Board, and in the latest opinion of this court concerning due process we said quoting from Nebbia v. New York, 291 U.S. 502, 54 Sup.Ct. 505, 78 L.Ed. 940, " 'due process * * * demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have real and substantial relation to the object sought to be attained.' " Montana Milk Control Bd. v. Rehberg, 141 Mont. 149, 376 P.2d 508.

In considering the taxing power of a county, the court, in Great Northern Ry. Co. v. Roosevelt County, 134 Mont. 355, 332 P.2d 501, quoting from Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865, said: " 'An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " See also

Opheim v. State Fish & Game Comm., 133 Mont. 362, 323 P.2d 1116.

A review of these opinions indicates that this court has carefully charted the procedural course for the administrative quasi-judicial agencies, both legislative and executive, however, this court's opinions have recognized that these quasi-judicial commissions have wide latitude in matters of discretion in considering the factual evidence. The court has pointed out that it is the duty of the court to examine the records made before the commissions to see that they do not act capriciously, arbitrarily or abuse their discretion and whether they acted according to law. Our numerous opinions concerning these administrative bodies have cautioned that they would be strictly held to the elementary and fundamental requirements of due process in all of their proceedings.

It almost goes without saying, because it is so self-evident, that an ex parte relationship of this type between quasi-judicial officials and litigants is improper. If engaged in by a judge it would clearly violate Canon 17 of the Canons of Judicial Ethics which states:

"*Ex parte Communications.* A judge should not permit private interviews, arguments or communications designed to influence his judicial action, where interests to be affected thereby are not represented before him, except in cases where provision is made by law for ex parte application."

For the appellant Commission to have indulged in such an ex parte relationship is equally improper. It violates the basic principle of American administrative law, that of so-called "exclusiveness of the record" under which administrative decisions are to be based solely on the public record. If one is empowered to act as a judge he should conduct himself as one.

Had the factual situation concerning this October 4 meeting remained as it did at the time it was heard in the district court, there would be no question that the Commission's action might have been reversible error. However, what happened at

the district court hearing, as concerned the October 4 meeting must be considered in light of the allegations made by respondents here on appeal.

In the pre-trial order of Judge Hatfield one of the issues of fact concerned this meeting.

(1) Concerning the meeting of October 4, 1961, were matters of explanation and evidence, if any, presented to the Commission without opportunity for cross-examination and rebuttal?

Too, one of Judge Hatfield's issues of law was:

(1)May the Public Service Commission hear explanations and evidence, if any, at a meeting with The Montana Power Company officials without consent or permission of plaintiffs or opposing groups?

Having thus framed an issue of fact and an issue of law to be presented, the burden of proof fell upon the appellants, The Montana Power Company and the Commission and the record before Judge Hatfield shows that they complied in every respect with the court's inquiry into the law and the facts of the October 4 meeting. All the officials of The Montana Power Company who participated in the October 4 meeting were present and available for direct or cross-examination by the respondents. In addition, the Commission had available two commissioners, Smith and Boedecker, who participated, plus William Johnson, Commission Auditor, and William Mufich, Commission Attorney. The latter two employees of the Commission were the persons designated by the Commission to make the post-hearing audit demanded by the respondents at the end of the hearing. With all the participants present, a full opportunity was accorded respondents to bring out all the facts, and to explore all of the ramifications of the October 4 meeting, plus any information they desired to obtain on the post-hearing audit made by Johnson and Mufich. They chose not to examine all the participants at the meeting but concentrated on Commissioners Smith and Boedecker, even though

the latter constantly stated in his testimony that it would be necessary to get that information from either Mr. Johnson or Mr. Mufich.

A summary of Commissioner Smith's testimony showed that Smith called the meeting with Boedecker's agreement. The Company officials were summoned to Helena as Commissioner Smith testified "to make the answer more clear than was in the record in Butte." He further stated that the information solicited did tend to clear up some questions he had but did not change his opinion as to the outcome of the case. It was not until he was cross examined by counsel for the Power Company that Commissioner Smith was tied down to what actually took place at the October 4 meeting and it was shown that his problem with the transcript occurred over testimony given by Mr. Harrington, the company treasurer, concerning income tax payments in the United States and Canada, and the reason Smith was troubled by the testimony was that he was not present when the testimony was given.

The next witness, J. J. Harrington, vice-president and treasurer of The Montana Power Company, was called and gave testimony concerning the income tax situation, but no question was directed to him concerning the October 4 meeting by the respondents. Counsel for the Power Company had to point this out, before the witness left the stand, and when the respondents chose not to go into the testimony of the meeting they said they would bring him back as their witness which they did.

Commissioner Boedecker was called and examined extensively concerning the post-hearing audit but not one question was asked on the October 4 meeting. Counsel for the appellant Power Company reserved the right to recall Mr. Boedecker on the basis of what happened at that meeting. When examined and cross examined as to this meeting, and its effect on the ultimate decision, he concurred with Commissioner Smith

as to what happened at the meeting, and said what he learned did not change his opinion or affect the ultimate decision.

Mr. Harrington testified fully as to what he told the commissioners at the October 4 meeting and it agreed in almost every detail with what Commissioners Smith and Boedecker had previously testified to concerning United States and Canadian income taxes.

██ With this testimony concerning the October 4 meeting, particularly the detailed statement by Mr. Harrington, the burden shifted to respondents to show damage to them resulting from the meeting. Having failed to do so, we cannot agree with the respondents' contention that the very denial of their right to cross examine immediately after the October 4 meeting denied them due process, in view of the record made here.

██ This court has previously said that where the statutes provide for judicial review of a particular order made or agreed upon by a prejudiced commissioner there is no denial of due process. State ex rel. Mueller v. District Court, 87 Mont. 108, 285 P. 928; State ex rel. Holt v. District Court, 103 Mont. 438, 63 P.2d 1026; Montana Power Co. v. Public Service Commission, (D.C.Mont.1935) 12 F.Supp. 946.

██ Regardless of the innuendo caused by the one-sided meeting called by the Commission, this court must assume that elected and appointed officials of this state who take oaths of office will live by that oath in the performance of their duties and will act honestly in accordance with law in the performance of their official duties. To hold otherwise would be to impede the operations of our state government.

Having failed to show that the meeting of October 4 changed the Board's decision even though the opportunity was availed them by having all persons available for examination, we find that the district court erred in holding that the respondents were denied due process.

██ The Railroad and Public Service Commission of this state differs from other administrative agencies of our state

government in that it is a department of our government created by the legislature, whose officials are elected to carry out and promote a legislative function. It is unique, in that it combines regulatory functions of a railroad commission, plus rate-making duties of a public service commission, which in most states are handled by separate commissions. Therefore, much of the case law of other states has no application to Montana. State ex rel. City of Billings v. Billings Gas Co., 55 Mont. 102, 173 P. 799; Billings Utility Co. v. Public Service Comm'n, 62 Mont. 21, 203 P. 366; Montana Citizens' Freight Rate Ass'n v. Board of Railroad Comm'rs, 128 Mont. 127, 271 P.2d 1024; State ex rel. James v. Aronson, 132 Mont. 120, 314 P.2d 849.

This court has pointed out that it is a legislative function to regulate public utilities and that the legislature can do so through an administrative agency. Too, that the acts of this agency are legislative and not judicial. Billings Utility Co. v. Public Service Comm'n, supra. Being a legislative function of our government, this court is always confronted in rate-making cases with the question of how far the court can go in interfering with, or directing the exercise of power, by an equal department of government. We have repeatedly held that there will be no interference with the orders of the Commission unless:

(1) they go beyond the power constitutionally given; or,

(2) beyond their statutory power; or

(3) they are based upon a mistake of law.

However, questions of fact may be involved in determination of questions of law, so that an order, regular on its face, may be set aside if it appears:

(1) that the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or

(2) that the Commission acted so arbitrarily and unjustly

as to fix rates contrary to evidence, or without evidence to support it, or

(3) that the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that substance, and not the shadow, determine the validity of the exercise of the power. This rule was first set forth by this court in Billings Utility Company v. Public Service Comm'n, supra, and has more recently been followed in State ex rel. Olsen v. Public Service Comm'n, 131 Mont. 104, 308 P.2d 633; Mountain States Telephone and Telegraph Co. v. Public Service Comm'n., 135 Mont. 170, 338 P.2d 1044; Montana Citizens' Freight Rate Assn. v. Board of Railroad Comm'rs, 128 Mont. 127, 271 P.2d 1024.

In Montana, the elected officials of the Commission, acting within their constitutional power, and in a legislative capacity, are accountable under their oath of office to the people only, just as are the members of this court, and this court will not interfere so long as they follow the law and the decisions of this court. The forum in which their actions are to be judged is in the minds and consciences of the people, whose servants they are, and who alone can hold them responsible for the manner in which they perform their duties.

 With the district court's conclusions of law and findings of fact that the respondents were denied a full and fair hearing, and that the due process clauses of our State and Federal Constitution were violated because of the post-hearing audit made by two employees of the Commission, we do not agree:

First, this audit was requested by respondents' counsel at the end of the hearing in Butte.

Second, a full and complete hearing lasting many days had taken place with both sides given ample opportunity to present all the evidence they had and to cross-examine opponents' witnesses.

Third, the Commission gave respondents permission, during

the hearings at Butte, to go into the Company books with their expert witnesses.

Fourth, in this case, the Commission hired an independent rate expert, Dr. John W. Kushing from Michigan. This employment of an independent rate expert to represent the State, seemingly fits the expressions in Mr. Associate Justice R. V. Bottomly's dissent in State ex rel. Olsen v. Public Service Comm'n, supra, 131 Mont. 104, at p. 118, 308 P.2d 633, at pp. 640, 641, wherein he commented that under our statutes "The Commission in expressing its power of regulating rates of a utility corporation must itself make its *due investigation* and appraise the value of the utility's properties, determine for itself the costs of operation, allow for depreciation, and designate a rate or rates that allow a fair return on the actual bona fide investment.

"It is the duty of the Commission to limit and regulate the use of the property, so far as profit and quality of service rendered is concerned.

"When the Commission simply sits as an automaton, without exercising its own initiative in determining all these factors by and through its own engineers, examiners, experts, accountants and other assistants provided for the Commission by R.C.M. 1947, § 70-118, and simply takes the testimony of the utility on such matters and questions, the Commission is not, in my opinion, fulfilling its duties and responsibilities to the public under the law of its creation.

"By reading the whole of Title 70, Public Utilities, Chapter 1, R.C.M.1947, it seems clear that the intent of the Legislature was that the State Public Service Commission would, through its own agents, make full disclosure of all matters under consideration, so that the members of the Commission could then check and weigh the facts developed by its own due investigation as against the evidence produced before it by a utility.

"It appearing that the Public Service Commission failed and omitted to make any independent investigation herein as

is provided for and required by the above statutes, I would reverse the judgment and send the matter back to the Commission to enable it to fully perform the duties so imposed upon it and thus allow it *to make* its own investigation and determination of the facts and circumstances before approving or allowing any rate increases whatever."

Fifth, Commissioner Smith testified that it was a commonly-accepted practice after a hearing for the Commission to have their experts check and investigate statements made before they issued an order.

Sixth, that the Commission was following the law in making such an investigation where they have questions, such an investigation being permissive under our statutes. State ex rel. Olsen v. Public Service Comm'n, supra.

Seven, the respondents failed to call Mr. Johnson and Mr. Mufich, who made the audit, the most important witnesses as to what they did during their independent audit.

Eight, under Rule 3.7 of the Commission Rules of Practice: "The Board reserves the right to conduct any independent investigation either before *or after* hearing to the end that it may be fully informed." (Emphasis supplied.) The Commission has delegated authority by law to establish rules and regulations for the conduct of their affairs; such rules and regulations have the force of law. State ex rel. James v. Aronson, 132 Mont. 120, 140, 314 P.2d 849.

A careful examination of this voluminous record fails to substantiate respondents' contentions and Judge Hatfield's findings concerning the post-hearing audits by Commission employees, that the Commission based its judgment upon evidence or information not in the record.

Concerning the sufficiency of the evidence, this court has often held that in reviewing the evidence the presumption is that the judgment is correct and every legitimate inference will be drawn by this court to support the findings of the lower court. State ex rel. Raw v. City of Helena, 139 Mont. 343, 363

P.2d 720; Nissen v. Western Construction Equip. Co., 133 Mont. 143, 320 P.2d 997.

However, after a careful study of all the testimony presented, we are unable to agree with Judge Hatfield that such a presentation was not made at the hearings before the Commission and before his court as would not come within the holding of this court in the Tobacco River Power Co. v. Public Service Comm'n, case, 109 Mont. 521, 98 P.2d 886, supra. There the court, 109 Mont. at p. 529, 98 P.2d at p. 890 said in considering section 70-106, R.C.M.1947 (then section 3884, R.C.M. 1935), "that considerable latitude is allowed the Public Service Commission in determining value. Neither the Public Service Commission nor the utility company is limited to or bound by any particular method in arriving at the solution of the question of value. It must be borne in mind always that the ultimate fact to be determined is value upon which rates are based, which must of course be done under proper legal procedure and restrictions.

"*The cost of reproduction new, less depreciation, is usually regarded as one of the most important, if not the dominant, factor, in the determination of value.* * * * Under the section of the Montana Code just cited, assessment rolls are likewise admissible as evidence of value, but of course are not exclusive * * *. Original cost, assessment values, cost of reproduction new, prudent investment theory, public records mentioned in section 3884, supra, and opinions of value are all means to an end, namely the determination of value.

"We can find no error in the procedure of the court in allowing evidence of cost of reproduction new, less depreciation, to be admitted as evidence of value."

The district judge carefully considered the evidence produced at Commission hearings and thoughtfully applied the proper case law to his findings. He recognized the "substantial evidence rule" followed by this court in our most recent cases: State ex rel. Olsen v. Public Service Comm'n, 131 Mont.

104, 308 P.2d 633, supra; Mountain States Tel. & Tel. v. Public Service Comm'n, 135 Mont. 170, 338 P.2d 1044, supra. Where we disagree is with his conclusions that within the record made at the hearing there is insufficient evidence to sustain the Board's orders. We find the record sufficient to uphold the Board's orders.

The complaint filed in district court by respondents seeking to set aside Order No. 2897 had alleged in part:

That it allowed Montana Power to use in calculating its rate base certain gas reserves consisting of natural gas in place "under grounds in and to which Montana Power has no property interest other than as a Lessee under an oil and gas lease."

That it included in the rate base leases on which no royalty was being paid and upon which there was no production.

These issues had been carefully analyzed by the Commission in its Order No. 2897. To show the extent and rationale of the Commission we shall quote at length from Order No. 2897.

### "THE RATE BASE

"The Company presented the following valuations for the combined natural gas operations for the test year 1962 for the Commission's consideration:

| | 1962 |
| --- | --- |
| "Reproduction Cost New Depreciated (RCND) | $118,413,926 |
| "Original Cost (OC) | 85,118,839 |
| "Original Cost Depreciated (OCD) | 60,144,210 |
| "Material and Supplies | 416,806 |
| "Working Capital | 501,510 |

"In this proceeding much was made of the natural gas leases held by the Company and whether they should be included in the rate base when royalties are not being currently paid.

"The protestants argued that under the uniform system of accounts that leases upon which royalties were not being paid should be included in the account property held for future use. Accounting-wise this is undoubtedly correct. However,

whether it is in the best interest of the Company and the rate payers to include this account, or part of this account, in the rate base is a matter for the judgment of the Commission. * * *

"The Commission has made a detailed study of the leases in question and finds that most of them are leases adjacent to producing leases. It appears to this Commission that it is only good business acumen for the Company to obtain leases protecting leases already held by the Company and that such leases are properly *includable in the rate base.*

"However, the Commission finds some of the leases in question are not properly includable in the rate base. The Commission has deducted from the plant figures submitted by the Company the following valuations:

RCND $478,200 OC $435,900 OCD $435,900

"Since the close of the hearing the Commission has been advised by the Company that they had surrendered leases 94657, 94659 and 94669 to 94679 inclusive. The following reductions were made as a result of this information:

OC $125,300 OCD $125,300

"Separation of the Canadian properties from the United States properties was advocated by the protestants.

"The protestants alleged that with the lower income tax rate in Canada, separating the properties would result in an operating expense reduction for the Company's combined operations. The basic premise set forth by the protestants being that a lower rate of return in Canada on production plant and a higher rate of return in the U. S. on production plant, as testified to by Company witnesses, would result in higher earnings and higher income taxes in the United States. The figures to which the witnesses referred were developed as part of a cost of service study. The Commission in setting a rate of return cannot set a rate of return on each component of plant.

"The Commission must set a rate of return on the fair value of the Company's plant used and useful to the public as a whole.

"The protestants also question the Commission's authority to consider any plant for rate base purposes not located within the boundaries of the State of Montana. The Commission has previously taken the position of considering for purposes of establishing a rate base any plant used and useful to the consumers of Montana, geographical location not being a factor. Re Montana Power Company (1958) 24 PUR 3d 321; RE Montana Dakota Utilities Co. (1949) 78 PUR (NS) 33, 46. The Commission reaffirms this position in the instant proceedings.

"The only question remaining on the subject is then whether a border price should be established or whether the Canadian properties should be considered as part of the Company's properties as a whole and the Canadian operating expenses 'rolled in' with the other Company operating expenses as shown on Exhibit 10. With a 'rolled in' system as a result of three companies being involved there necessarily follows a duplication of expense in the purchase of gas. The Commission has determined that this duplication of expense was 'washed out' on Exhibit 10. No evidence was introduced showing that an establishment of a border price would necessarily result in lower rates to the Montana consumer.

"The Commission, after a thorough investigation of the 'separations' theory, is of the opinion that by using the 'separations' theory with the concomitant border price establishment they would lose control over the Canadian operations.

"The Commission is further of the opinion that the 'rolled in' theory referred to above is the method by which they can best keep control of the Canadian operations of the Company with the resultant benefits afforded the rate payers.

"The protestants also in regard to the plant accounts, questioned the propriety of entering the Pakowki Lake properties in the books of the Company at $10,000,000, the purchase price claimed by the Company. The protestants showed that after a $2,000,000 down payment the balance was a non-interest bearing contract of $8,000,000 payable at the rate of $500,000 per

year for sixteen years. Protestants argued that interest in a transaction of this sort should be implicit and the face value of the contract should be discounted at the prevailing interest rate at the time of entering into the contract.

"The Commission agrees with the protestants that this contract should be in effect discounted and that the part found to be interest should be removed from the valuation figures submitted by the Company. The Commission believed this necessary to forestall interest creeping into the capital accounts.

"It is now necessary to determine what interest rate is applicable. The protestants argue that the interest rate should be that interest rate prevalent in Canada at the time of the transaction. However, it is evident from the history of the Montana-Canadian Gas Company that it has depended upon The Montana Power Company for its financing. Therefore, the Commission is of the opinion that it should look at the interest rates available to The Montana Power Company at the time of the transaction. The Commission has obtained from the records of the Federal Reserve System information that the 'prime' interest rate ranged from 2% in 1950 to 3% for the year 1952. The time involved is limited to 1950 through 1952 because the purchase contract was signed in 1950 and the $2,000,000 down payment was made in 1952. Moody's shows that new publicly offered bonds for the same period had a high yield of 3.25% for AAA bonds and a high yield of 3.4% for AA bonds. Therefore, the Commission has determined that this $8,000,000 contract should be discounted at a 3.25% rate.

"On an amortization basis this would leave the principal amount of the contract at $6,162,180 and the interest payments over the sixteen year period at $1,837,820. The Commission realizes that using an amortization basis will result in a higher total interest figure than if serial bonds were used. However, with the evidence presented this is the only method possible

to use. The Commission therefore reduces the valuation figures submitted by the Company by the following amounts:

"OC $1,838,000 and OCD $1,838,000.

The interest payment for the test year would amount to $101,-000. This would of course have an income tax effect and will be discussed later under Operating Results.

"The RCN valuation of the Company's gas reserves came in for considerable discussion. The Company revalued their reserves on the basis of a transaction with the State of Montana. This resulted in an increase in valuation of some nine times. The Commission does not believe that valuation by a spot transaction such as this truly reflects the value to the user of the Company's properties. The Commission is well aware that the value of these reserves has increased since the Company obtained possession. However, it feels that this type of valuation is what the Court was referring to in Willcox v. Consolidated Gas Co., 212 U.S. 19, 52, 29 S.Ct. 192, 200, 53 L.Ed. 382, when it said in holding that the Company was entitled to a return based on the enhanced value of its properties in excess of original cost:

" '* * * This is, at any rate, the general rule. We do not say there may not possibly be an exception to it where the property may have increased so enormously in value as to render a rate permitting a reasonable return upon such increased value unjust to the public.'

"The brief of the Great Falls Gas Company interjected another treatment of gas reserves. They argued that natural gas being a wasting asset its value should be removed from the element of value, original cost, as it is depleted.

"The Commission is in accord with this reasoning. The Commission has investigated the records of the Company and has determined that on December 31, 1962, there would be $5,575,000 accrued depletion on production lands. The original cost valuation submitted by the Company will be reduced by this amount. The Commission will also reduce the RCND valu-

ation for gas reserves by $6,765,000 as it believes this will then place the revaluation of the gas reserves at an amount not repugnant to fair earnings and corresponding just rates.

"Most of the RCN studies by the Company were made with the aid of multipliers developed from the Handy-Whitman Index. A representative of the firm publishing this index made a review of the study of the Company and the figures presented to the Commission were a result of the review and the study. The Commission's expert witness, a graduate engineer, also reviewed this study at the request of the Commission and expressed his approval of the methods used and the results of the study.

"The Commission however is not satisfied with the manner in which well-drilling costs were reproduced. The Company witness testified that in his opinion the well-drilling costs for the period 1932-34 were above normal. In reviewing the RCN studies, the Commission found that the multiplier used to arrive at RCN values had been applied to these above normal costs as well as the normal costs. The Commission believes that these above normal costs should have been normalized before applying the multiplier. Therefore, the Commission finds that the RCN valuation was overstated by $808,500. As a result of this finding the RCND valuation is being reduced by $582,400.

"The plant figures submitted by the Company, other than the above, will be accepted by the Commission.

"The Company also requested that the rate base include $416,806 for materials and supplies and $501,510 for working capital. The tax accruals are sufficient to supply the working capital necessary and the $501,510 is disallowed. It has been found in previous cases that normally 50% of the materials and supplies account is used for maintenance and 50% for construction. The Commission will follow precedent and allow $208,403 for materials and supplies.

"This Commission in recent years has used fair value as

opposed to original cost depreciated in determining the rate base in all rate cases where evidence supporting fair value has been introduced. The determination of fair value is always a problem of some magnitude.

"The assessed valuation for 1962 of course was not available to the Commission. The 1960 assessed valuation of total properties was $29,329,436. This increased to $32,707,063 in 1961.

"The Commission has considered the elements of value listed above and after giving weight to the valuation changes hereinbefore enumerated and after also giving weight to the purchase of service lines hereinafter ordered, the Commission sets the projected fair value of the Company's combined natural gas United States and Canadian properties devoted to the use of the public and actually used and useful for the convenience of the public at $89,900,000 as of December 31, 1962."

The foregoing lengthy quotation is set forth to show the very careful attention given to the problem of rate base. The Commission determined just what gas leaseholds and gas reserves were used and useful as required by our statute, R.C.M.1947, § 70-106 (and see State ex rel. Olsen v. Public Service Commission and Mountain States Telephone and Telegraph Company, 131 Mont. 272, 309 P.2d 1035).

The valuation of the gas reserves was the only evidentiary question on the rate base raised by the district court's order of April 26, 1962, and by the court's findings of fact. The record is abundantly clear that complete, detailed information in the form of testimony and exhibits was introduced. It is true that the subject matter and testimony concerning it is complicated but nontheless it is abundantly clear.

As reflected by the Commission order previously quoted in part, the Commission did not accept the Company figures at face value but applied its own reasoning and study to reduce the fair value figure of the Company from $118,413,926 to $89,900,000. Of this reduction, some are spelled out; but as

to that applying to gas reserves they are not in detail, lease by lease. As to the gas reserved the Commission analyzed the mass of evidence as to value and then in the exercise of its discretion reduced the figure by $6,765,000. It is interesting to note that protestants' Exhibit 40 listed the leases upon which the Company was not paying royalty as being of a value of $8,105,421. Exhibits 44 and 45 are detailed showings as to the then present status of the leases referred to in Exhibit 40. Certainly from such a wealth of information the Commission could, as it did, exercise its discretion in placing its valuation on gas reserves that are actually used and useful for the convenience of the public.

The Commission's decision finds support in the evidence and thus the district court was in error in setting it aside.

The writer of this opinion respectfully dissents to the latter conclusion of a majority of this court that the Commission decision finds support in the evidence insofar as the value of gas leaseholds included in the rate base are concerned. The evidence produced by the appellants concerning the gas reserves is not limited to the specific reserves owned by the appellant Company or being presently utilized by appellant. A careful examination of the testimony, especially that given by Mr. Woy of the appellant Company, indicates some question as to whether or not non-producing leases were included in the rate base. While the appellants argue that sufficient evidence was produced, and that the appellant Commission did cut some $6,765,000 valuation off the Company's gas reserves, I am still of the conclusion that as to the reserves, further clarification should be had as to exactly what was included in the rate base in the field of presently producing leases and those held for future use. I agree with the district court that to charge the present day rate payer for something to be used in the future is placing an undue burden on already burdened rate payers. A public utility is entitled to such rates as will permit it to earn a return on the value of the property em-

ployed by it to the public benefit, but it has no right to profits such as are realized or anticipated from speculative ventures.

The value that must be ascertained is the reasonable value of the Montana Power Company's leases used and useful for the public service at the time it is being used and in the immediate future. I would remand to the district court with instructions to return the case to the Commission in order to give it an opportunity to reconsider the evidence on the gas leases used by the Commission in its rate-base computations. Such reconsideration of the gas leases would be had on notice to The Montana Power Company and protestants and be limited to the reserves owned and leased by the Company that were figured into the present rate, and whether or not speculative leases, not presently in use, were used by the Commission in their rate base. In so disposing of the lease question, I would not have held that the protestants are entitled to a decrease, nor that the Company was not entitled to the increase. It may well have been, that upon reconsideration of the entire lease structure of the Company, that a reduction is called for. If such be the result reached, then in justice, the consumers should be entitled to the reduction as of the date of the Commission's original order. If the testimony did not show that non-user prospective leases were figured into the rate base by the Commission's Order, then the Order would remain unchanged.

However, as recited before, a majority of the court has found that there is ample testimony on the leaseholds as to being used and useful to support the Commission.

For the foregoing reasons, the judgment of the district court is reversed and Commission orders No. 2897 and 2897A are affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES CASTLES and DOYLE, concur.

MR. JUSTICE ADAIR, (dissenting).

In my opinion the District Court's judgment was and is correct and proper and I would affirm such trial court's judgment in its entirety.