THE STATE OF MONTANA, ON RELATION OF THE STATE BOARD OF EQUALIZATION, AND DAN FULTON, JOHN C. ALLEY AND J. MORLEY COOPER, AS MEMBERS OF AND CONSTITUTING THE STATE BOARD OF EQUALIZATION, PLAINTIFFS AND APPELLANTS, *v.* W. F. KOCH, AS COUNTY ASSESSOR OF THE COUNTY OF YELLOWSTONE, EDMOND S. REDDING, AS COUNTY CLERK AND RECORDER OF THE COUNTY OF YELLOWSTONE, THE BOARD OF COUNTY COMMISSIONERS OF YELLOWSTONE COUNTY, AND THOMAS H. DECKERT, A. A. HEALOW, AND JOE JOSEPHSON, AS MEMBERS OF AND CONSTITUTING THE BOARD OF COUNTY COMMISSIONERS OF YELLOWSTONE COUNTY, MONTANA, DEFENDANTS AND RESPONDENTS.

No. 10860
Submitted March 12, 1965. Decided May 12, 1965.
401 P.2d 765

William A. Douglas (argued), Helena, for plaintiffs and appellants.

William J. Speare (argued), Billings, for defendants and respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment of the District Court of the Thirteenth Judicial District in Yellowstone County. The appellant State Board of Equalization issued a directive to the respondent Board of County Commissioners and to the respondent County Assessor of Yellowstone County in November, 1963. This directive, among other things, required the

respondents to use certain valuations on the grades of, and certain classes of, property, specifically nonirrigated farm land. As to these lands the respondents refused to use the valuations which were set forth in appellant's directive, but used valuations that were twenty percent less than appellant's valuations. Appellant brought an action for a writ of mandate against the respondents to enforce its directive. After an alternative writ issued, respondents made a return and hearing was had. The district court made findings of fact and conclusions of law. The conclusions of law were to the effect that (1) a writ of mandate would be futile and ineffective because it would be impossible for the respondents to comply; and, (2) that the *possibility* of change in the directive by the State Board demonstrated no *present* right to a writ of mandate. The proceedings were ordered dismissed, and the State Board appealed.

Three specifications of error are urged as follows:

I. The court erred in its conclusion of law that the issuance of a peremptory writ of mandate commanding the respondents to comply with the directive of the State Board of Equalization in fixing the valuations of non-irrigated farm land for the purposes of assessments and taxation in the year 1964 would be futile and ineffective for the reason that it would be impossible for the respondents to comply with such a peremptory writ.

II. The court erred in its conclusion of law that by reason of the possibility of a change in or withdrawal of appellant's directive of November 14, 1963, before the preparation of the 1965 assessment roll in Yellowstone County, no present right has been shown for the issuance of a writ to enforce compliance with said directive in 1965.

III. The court erred in its judgment that appellant's cause be dismissed and the alternative writ of mandate which was issued be discharged.

The position of the respondent county officials, hereinafter

referred to as respondents, and of the district court, is that on July 22, 1964, it was physically impossible to legally effect the changes in the property valuations and the corresponding changes in assessments so that these valuations and assessments would conform to appellant's directive for the 1964 tax year. It is further the position of the district court that because the appellant's directive stated that it was to apply to the tax year 1964, and thereafter until or unless withdrawn by further directives, there is no present right for the issuance of a writ to enforce compliance with appellant's directive for the 1965 tax year. To these positions the State Board is diametrically opposed in that it feels that sections 84-601 and 84-602, R.C.M.1947, empower the county boards of equalization to perform changes in appraisals and assessments within their county while they are sitting as a county board of equalization between the third Monday of July and the second Monday of August, and therefore, an order from the court requiring the county board to perform changes during that period of time could have been complied with.

Turning to Specification of Error No. 1. On November 14, 1963, the State Board issued and the respondent county officials received a directive which directed that the assessor in each Montana county fix: "1. The assessment of the following classes and grades of agricultural lands shall be at the following values per acre for 1964." Then follows the various classifications of agricultural land with assessed valuations assigned to each.

Following that, on June 1, 1964, the State Board advised all county assessors and county commissioners that the directive of November 14th was in full force and effect.

In the meantime, on February 25, 1964, the State Board by questionnaire asked whether, in effect, their directive was being followed. The Yellowstone questionnaire in response showed a refusal to follow the directive relative to valuation of nonirrigated farm lands which were "discounted" (for want

of a better term) twenty percent from the figures directed by the State Board.

On May 28, 1964, the State Board sought a writ of mandate to compel compliance. On July 6, 1964, a hearing was held, and on August 5, 1964, the Court refused to issue the writ for the reasons previously stated.

Revised Codes of Montana 1947 procedural statutes relative to assessment processes provide as follows:

Section 84-503, R.C.M.1947, requires the county assessor to have completed the assessment book on or before the second Monday in July.

Section 84-505, R.C.M.1947, requires the assessment book, as soon as it is completed, to be delivered to the county clerk, who will give notice of the dates during which the county commissioners will meet to equalize assessments.

Section 84-601, R.C.M.1947, requires the county board of commissioners to sit as a county board of equalization on the third Monday of July for the purpose of equalizing assessments, but not later than the second Monday in August.

Section 84-602, R.C.M.1947, empowers the county board of equalization to increase or lower either a single assessment or a whole class of assessments to make the assessments conform to the true value of the property which the assessment represents. This section also empowers the board of county commissioners to make a percentage change in valuations of an entire class of property.

Section 84-610, R.C.M.1947, requires the county clerk to record in a book kept for that purpose all changes, corrections and orders made by the county board of equalization and during the time the county board of equalization is in session, or as soon as possible after its adjournment, and the county clerk will enter upon the assessment book all changes and corrections made by the board.

Section 84-610, R.C.M.1947, also requires the county clerk, on or before the *first Monday in August,* to affix his affidavit to

the assessment book, which affidavit is in the following words:
"I_____do swear that, as county clerk of_____
county, I have kept correct minutes of all the acts of the board
of county commissioners touching alterations in the assessment
book; that all alterations agreed to or directed to be made
have been made and entered in the book, and that no changes
or alterations have been made therein except those authorized."

Chapter 40 of Title 84, R.C.M.1947, sets forth the duties of
the county clerk and county assessor in relation to the com-
putation and entry of taxes.

Section 84-4002, R.C.M.1947, of that chapter requires the
county clerk, on or before the *second Monday in August,* to
prepare a statement from the assessment book, as corrected by
the board of county commissioners, (county board of equali-
zation) showing total valuations of property within the county.

Section 84-4003, R.C.M.1947, requires that the county clerk
then transmit a copy of the statement to the state auditor and
the state board of equalization.

Section 84-4004, R.C.M.1947, contemplates that if the State
Board of Equalization, after receipt of the statement from the
county clerk, makes any changes in the assessment book, or in
any assessment therein contained, the county clerk will effect
such change in the assessment book, and if the book is not in
the possession of the county clerk he will transmit such state-
ment to the county official who does have possession of the
book, accompanied by an attested copy of the changes re-
quired by the State Board of Equalization, and that the other
county official will effect such changes in the assessment book.

Section 84-4006, R.C.M.1947, requires the county clerk, with-
in five days after the *second Monday in August* to attach the
following affidavit to the assessment book:

"I, _____ county clerk of the county of _____,
do swear that I received the assessment book of the taxable
property of the county from the county assessor with his affi-
davit thereto affixed, and that I have corrected it and made

it conform to the requirements of the county and state board of equalization.", and then deliver the book to the county assessor.

Section 84-4005, R.C.M.1947, requires the county assessor to compute the taxes in the assessment book and deliver the assessment book to the county clerk on or before the second Monday of October.

Section 84-4007, R.C.M.1947, then requires the county clerk, on or before the third Monday of October, to charge the county treasurer with the full amount of taxes levied and to deliver the original assessment book to the county treasurer.

Section 84-3805, R. C. M.1947, requires the board of county commissioners, on or before the *second Monday in August*, to fix the rate of county taxes and designate the number of mills on each dollar of valuation of property for each fund and levy taxes upon the taxable property of the county.

The foregoing reference to the use of statutes spells out the assessment procedure substantially identical to the assessment procedure that was set out by the court in the case of State ex rel. Fadness v. Eie, 53 Mont. 138, 146, 147, 162 P. 164.

Further, we call attention to our opinion in State ex rel. Board of Equalization v. Kovich, 142 Mont. 201, 383 P.2d 818, wherein Constitutional provisions and statutes are discussed in relation to authority, duties and procedures of the various tax authorities, assessors, county boards and the State Board. We note, too, that following this opinion, handed down on July 12, 1963, the State Board held a hearing on September 22, 1963, and subsequently as a result of its findings, issued the directive here involved. The validity of the hearing had is not involved here.

■■ It is clear that the appellant State Board is vested with authority to issue a directive under its powers of adjustment, equalization and supervision as are set forth in Section 15, Article XII, of the Montana Constitution and R.C.M.1947, § 84-708. As noted in State ex rel Schoonover v. Stewart, 89

Mont. 257, 297 P. 476, the people " 'put beyond legislative detraction' the following co-ordinate grants of power to the state board of equalization" and enumerated them.

Respondent, however, declares that the enumeration did not include the power to issue the directive such as here. What the court said in the Schoonover case at p. 269 of 89 Mont., at p. 479 of 297 P. follows:

"More comprehensive words could hardly have been chosen to express the intention of the people to confer upon the state board broad and far-reaching power in matters relating to taxation. Butte & Superior Min. Co. v. McIntyre, 71 Mont. 254, 229 P. 730. As counsel for respondents say, by adopting the 1922 amendment the people 'put beyond legislative detraction' the following co-ordinate grants of power to the state board of equalization: (a) to adjust and equalize the valuation of the taxable property among the several counties; (b) to adjust and equalize the valuation of the different classes of taxable property in any county; (c) to adjust and equalize the valuation of the different classes of taxable property in the several counties; (b) to adjust and equalize the valuation of the different classes of taxable property between the individual taxpayers; (e) to supervise and review the acts of the county assessors; (f) to supervise and review the acts of county boards of equalization; (g) to change, increase, or decrease valuations made by county assessors; (h) to change, increase, or decrease valuations equalized by county boards of equalization; and (i) to exercise such authority and do all things necessary to secure a fair, just and equitable valuation of all taxable property among counties, between the different classes of property, and between individual taxpayers. In addition, the people declared that the state board 'shall have such other powers, and perform such other duties relating to taxation as may be prescribed by law.' "

We cannot read the foregoing without stating as we have before, it is clear that the State Board does have Consti-

tutional power to supervise and to exercise such authority and do all things necessary to secure a fair, just and equitable valuation, *including,* under circumstances shown to exist, the issuance of such a directive. The desirability, yea the necessity, for such guidance and direction is indicated by the testimony of Mr. Fulton taken at the hearing in the District Court as follows:

"Q. Well all right. Now going back to your directive, Mr. Fulton, this directive purports to be issued to all County Assessors and County Commissioners. How many counties in the State of Montana have not complied with this directive, and as far as that goes with any other directive?

"Mr. Douglas: Your Honor, I object to the question referring to any other directive.

"The Court: Well insofar as any other directive is concerned I will sustain the objection. We will confine ourselves to the particular directive which is the basis of the plaintiffs' proceeding here today.

"(Last question read, leaving out the last phrase of the question.)

"A. Well there is probably about, oh in the vicinity of fifteen that haven't complied fully. Now as to exactly how many there is that haven't complied with any part of it, because I would have to go into other things, there is probably only three or four counties that haven't complied with any portion of it. Around fifteen counties that have not complied with portions of it, most of them indicated that they will comply with it next year. There are around forty counties that have complied with all parts of it this year. The ones that haven't complied, there is several of them that tell us that they will comply next year but precisely how many have not complied I would have to go into the details of the questionnaires and there is one or two counties that we don't have the questionnaires from. There are forty counties that have complied with practically all of it and

several of the rest of them have complied with portions of it, including Yellowstone incidentally."

■ Added to this, we take judicial knowledge of the situation shown to exist in the Kovich case, supra.

Much is made in respondents' brief and argument that to allow the State Board to direct, as here, is to usurp the county assessor's duties. Not so, the task is primarily performed by the county assessor; but such performance is accomplished under supervision and direction of the State Board.

However, returning now to Specification of Error No. 1 specifically, it seems clear that the district judge made his conclusion that for the purposes of the taxable year 1964, the mandate directing the county officials to comply with the directive "would be futile and ineffective, for the reason that it would be impossible for the defendants to comply" because of his finding of fact that there were approximately 3,500 different parcels of land assessed as nonirrigated farm land comprising 190,692 acres separated into thirteen different grades each assessed at a different valuation and that even employing extra help would require three or four weeks to change the 1964 assessment.

■ We are not impressed with such "impossibility." Who was it who said "the difficult we do immediately; the impossible takes a little longer"? The county officials had from November to the second Monday in August to accomplish the task. They had arbitrarily cut, according to their response to the State Board's questionnaire, twenty percent. Reinstitution of twenty percent should not have been an impossibility since with full knowledge of the alternative writ having issued on June 3, 1964, they chose not to do anything except to contest the matter. Their view, as Admiral Farragut once said was, "damn the torpedoes, go ahead."

We thus hold that the trial court was in error in refusing to grant the writ.

Respondents go further, however, and now argue that in any

event at this late date the matter is moot because 1964 taxes have already been collected and the compliance at this date is legally impossible. What respondents really are saying is that the State Board's remedy by appeal to this court takes enough time that each year the problem is moot before this court can act. This brings us to a discussion of the second specification of error.

The trial court concluded as a matter of law that by reason of the "possibility of a change in or withdrawal of appellant's directive of November 14, 1963, *no present* right has been shown for the issuance of a writ to enforce compliance with the directive in preparation for the 1965 tax assessment exists."

This suggests a rather strang situation. The State Board in performing its duties is either too late or too early. If it is late, the changes it directs are impossible to accomplish. If it is early, the possibility of change does not give it a "present right."

The construction placed upon appellant's directive is that since it may be changed or withdrawn no present right attaches.

The directive concluded:

"This directive withdraws and supersedes all previous directives with which it may be in conflict. It applies to 1964 and thereafter until and unless withdrawn by future directive."

It seems almost needless to point out that even statutes passed by the legislature are laws until and unless amended or repealed. That does not make them any the less effective nor establish any less *present* right or duty under them. Thus, we hold the district court was in error.

As to the third specification of error, that the appellant's cause be dismissed, we have already indicated it should not have been.

Now, having held the district court to have erred, we come to a disposition of the case. The 1964 tax year having come and gone for assessment purposes, we shall not go back

that far; but as to the 1965 assessment proceedings, the matter is returned to the district court for its entry of an order directing the county officials of Yellowstone County to comply with the State Board's order insofar as it affects the 1965 assessment structure.

It is so ordered.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN CONWAY HARRISON, DOYLE and ADAIR concur.